KARIN G. PAGNANELLI (174763)
  kgp@msk.com
MARC E. MAYER (190969)
  mem@msk.com
GILBERT LEE (267247)
  gsl@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone:   (310) 312-2000
Facsimile:   (310) 312-3100

Attorneys for Defendants ACTIVISION
BLIZZARD, INC., ACTIVISION
PUBLISHING, INC., VOYETRA TURTLE
BEACH, INC., PENGUIN GROUP (USA),
INC., and MICROSOFT CORPORATION
and Counterclaimant ACTIVISION
PUBLISHING, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVALOGIC, INC., a California corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>ACTIVISION BLIZZARD, a Delaware corporation; ACTIVISION PUBLISHING, a Delaware corporation; VOYETRA TURTLE BEACH, INC., a New York corporation; PENGUIN GROUP (USA), INC., a Delaware corporation; MICROSOFT CORPORATION, a Washington corporation; and DOES 1 through 10,<br><br>          Defendants. | Case No. CV12-04011 JFW (SHx)<br><br>The Honorable John F. Walter<br><br>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANTS ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., AND PENGUIN GROUP (USA), INC.;**<br><br>**DECLARATIONS OF CHRISTOPHER BUTLER, MICHAEL CONDREY, OMER SALIK, TIM FITZPATRICK, JAMES BERKLEY, AND MARC E. MAYER FILED HEREWITH** |
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>          Counterclaimant,<br><br>     v.<br><br>NOVALOGIC, INC., a California corporation,<br><br>          Counterclaim Defendant. | **SEPARATE STATEMENT OF UNDISPUTED FACTS AND [PROPOSED] ORDER LODGED HEREWITH**<br><br>DATE:      April 15, 2013<br>TIME:      1:30 p.m.<br>CTRM.:   16 |

Mitchell
Silberberg &
Knupp LLP

5114759.12

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 15, 2013, at 1:30 p.m., or as soon as the matter may be heard in the courtroom of the Honorable John F. Walter, Defendants Activision Publishing, Inc., Activision Blizzard, Inc., and Penguin Group (USA), Inc. (the "Moving Parties") will and hereby do move pursuant to Fed. R. Civ. P. 56 for partial summary judgment on all of NovaLogic's claims against the Moving Parties to the extent they arise out of (1) the video game "Call of Duty: Modern Warfare 3" and (2) the "Bradygames" Signature Series Strategy Guide for "Call of Duty: Modern Warfare 3."

This Motion is made on the basis that Plaintiff NovaLogic's claims against the Moving Parties for trademark infringement, false designation of origin, contributory trademark infringement, and common law trademark infringement are barred by the First Amendment to the U.S. Constitution to the extent that such claims arise out of (1) the video game "Call of Duty: Modern Warfare 3" and (2) the "Bradygames" Signature Series Strategy Guide for "Call of Duty: Modern Warfare 3." Such claims are precluded by Rogers v. Grimaldi, 875 F.2d 994, 999 (2d Cir. 1989), and E.S.S. Entertainment 2000 v. Rock Star Videos, 547 F.3d 1095, 1099 (9th Cir. 2008), because the use of the "Delta Force" name and a related insignia is artistically relevant to these expressive works and is not explicitly misleading.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Separate Statement of Undisputed Facts lodged concurrently herewith, the Declarations of Christopher Butler, Michael Condrey, Omer Salik, Tim Fitzpatrick, James Berkley, and Marc

Mitchell
Silberberg &
Knupp LLP

5114759.12

1

1   E. Mayer, reply papers filed by Defendants, and any papers and pleadings on file

2   herewith.

3

4        This Motion is made following a conference with counsel pursuant to

5   L.R. 7-3, which took place on March 4, 2013.  Declaration of Marc E. Mayer, ¶ 4.

6

7   Dated:  March 14, 2013              KARIN G. PAGNANELLI
                                        MARC E. MAYER
8                                       GILBERT LEE
                                        MITCHELL SILBERBERG & KNUPP LLP
9

10                                      By: __/s/  Marc E. Mayer_____
                                            Marc E. Mayer
11                                          Attorneys for Defendants
                                            ACTIVISION BLIZZARD,
12                                          ACTIVISION PUBLISHING,
                                            VOYETRA TURTLE BEACH, INC.,
13                                          PENGUIN GROUP (USA), INC., AND
                                            MICROSOFT CORPORATION, AND
14                                          COUNTERCLAIMANT ACTIVISION
                                            PUBLISHING, INC.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

# **TABLE OF CONTENTS**

**Page**

Introduction........................................................................................................1

I.      STATEMENT OF UNDISPUTED FACTS. ...........................................4

II.     THE LEGAL STANDARD. ...................................................................15

III.    THE FIRST AMENDMENT BARS NOVALOGIC'S CLAIMS
        ARISING FROM THE USE OF DELTA FORCE AND THE MW3
        DELTA LOGO IN MW3. ......................................................................15

        A.      The Delta Force And MW3 Delta Logo Have Clear And Direct
                Artistic Relevance To MW3. .....................................................18

        B.      The Use Of Delta Force And The MW3 Delta Logo In MW3 Does
                Not Expressly Mislead As To NovaLogic's Sponsorship Or
                Endorsement...............................................................................21

IV.     NOVALOGIC'S CLAIMS AGAINST BRADY ALSO ARE BARRED
        BY THE FIRST AMENDMENT............................................................24

V.      NOVALOGIC'S CLAIM FOR "COMMON LAW TRADEMARK
        INFRINGEMENT" ALSO FAILS............................................................25

Conclusion ........................................................................................................25

Mitchell
Silberberg &
Knupp LLP

5114759.12

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Bleistein v. Donaldson Lithographing Co.,
    188 U.S. 239 (1903) ............................................................................... 18

Bouchat v. Baltimore Ravens Ltd. Partnership,
    619 F. 3d 301 (4th Cir. 2010) ............................................................... 19

Brown v. Electronic Arts, Inc.,
    No. 2:09-CV-01598-FMC, 2009 WL 8763151
    (C.D. Cal. Sept. 23, 2009) ............................................................. *passim*

Brown v. Entertainment Merchants Association,
    131 S. Ct. 2729 (2011) .......................................................................... 16

Brownmark Films, LLC v. Comedy Partners,
    682 F.3d 687 (7th Cir. 2012) ................................................................ 15

Campbell v. Acuff-Rose Music, Inc.,
    510 U.S. 569 (1994) ............................................................................... 18

Capcom v. MKR Group,
    No. C 08-0904 RS, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ................... 21

Cliffs Notes Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,
    886 F.2d 490 (2d Cir. 1989) ................................................................. 23

Dillinger LLC v. Electronic Arts Inc.,
    No. 09-cv-1236, 2011 WL 2457678
    (S.D. Ind. June 16, 2011)............................................................... *passim*

E.S.S. Entertainment 2000 v. Rock Star Videos,
    547 F.3d 1095 (9th Cir. 2008) ......................................................... *passim*

Interactive Digital Software Association v. St. Louis County, Mo.,
    329 F.3d 954 (8th Cir. 2003) ................................................................. 16

Kirby v. Sega of America, Inc.,
    144 Cal. App. 4th 47 (2006) ...................................................... 15, 16, 24

L.L. Bean, Inc. v. Drake Publishers, Inc.,
    811 F.2d 26 (1st Cir. 1987) .................................................................. 15

Mitchell
Silberberg &
Knupp LLP

5114759.12

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Louis Vuitton Mallatier S.A. v. Warner Brothers Entertainment Inc.
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ........................................................... 21,22

Mattel, Inc. v. MCA Records, Inc.,
    296 F.3d 894 (9th Cir. 2002) ............................................... 15, 16, 17, 21

Mattel Inc. v. Walking Mountain Productions,
    353 F.3d 792 (9th Cir. 2003) ................................................... 17, 18, 25

Rogers v. Grimaldi,
    875 F.2d 994 (2d Cir. 1989) ...................................................... *passim*

Roxbury Entertainment v. Penthouse Media Group,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009) ................................... *passim*

Winchester Mystery House, LLC v. Global Asylum, Inc.,
    210 Cal. App. 4th 579 (2012) ........................................................ 21, 23

## STATUTES

15 U.S.C. § 1114 ...................................................................................... 14

15 U.S.C. § 1125(a) ................................................................................. 14

Cal. Civ. Code § 3294 ............................................................................. 25

1    **<u>Introduction</u>**

2        This lawsuit is an attempt by a largely defunct video game publisher to claim

3    exclusive worldwide rights in the famous real-life United States Army unit known

4    as "Delta Force."  Plaintiff NovaLogic, Inc. ("NovaLogic") seeks to prevent

5    Defendants, a video game maker and its licensees, from using, or even referencing,

6    this iconic organization and its well-known insignia in a video game (and its

7    related strategy guide) that depicts the fictional adventures of these elite Army

8    soldiers.  Plaintiff's misguided theory – namely, that its purported ownership of a

9    registered trademark in Delta Force and its preexisting associated logo somehow

10   entitles it to exclude others from depicting this U.S. Army unit in video games or

11   other expressive works – ignores, and is contrary to, the First Amendment and the

12   purposes and policies of trademark law.  Irrespective of NovaLogic's purported

13   trademark rights, Novalogic cannot, as a matter of law, prevail on its claims to the

14   extent they arise from the creative and expressive use of Delta Force and a related

15   insignia in the "Call of Duty: Modern Warfare 3" video game or its strategy guide.

16       The facts are not subject to dispute.  NovaLogic is a video game publisher

17   that, starting in 1998, released a series of games titled "Delta Force" (the

18   "NovaLogic Games").  The NovaLogic Games are based on the exploits and

19   adventures of the army's elite counterterrorist unit known as the "Delta Force"

20   (formally, the "1st Special Forces Operational Detachment-Delta").  As NovaLogic

21   described its games: "You're a member of the U.S. Army's best-kept secret: the

22   elite SPECIAL OPERATIONS unit known as Delta Force...."  To further cement

23   this message, the NovaLogic Games were marketed using a lightning bolt and

24   dagger insignia that has been widely known for decades as the ***Army's*** "Delta

25   Force" insignia.  This preexisting insignia has been emblazoned on mugs at high-

26   level military facilities; depicted on the cover of books about the Delta Force;

27   made available for purchase on T-shirts, pins, commemorative coins, and other

28   merchandise; and even featured in a motion picture ("The Delta Force") released

1    more than **ten years** before NovaLogic's first purported use.

2       Activision Publishing, Inc. ("Activision") is the world's leading video game

3    developer and publisher, and is the owner and publisher of the blockbuster "Call of

4    Duty" video game franchise, including three "Call of Duty: Modern Warfare"

5    games. Activision's most recent "Call of Duty: Modern Warfare" game – the 2011

6    game "Call of Duty: Modern Warfare 3" ("MW3") – depicts the adventures of

7    several fictional special forces operatives, including members of the United States

8    Delta Force; members of the British Special Air Service ("SAS"); and agents of the

9    Russian FSO (Federal Protective Service), in a race against time to thwart the

10    efforts of international terrorists. The words "Delta Force" and an associated logo

11    (the "MW3 Delta Logo") are used during MW3 to identify and introduce the Delta

12    Force unit depicted therein. Ultimately, the depiction of the name and logo

13    comprises a small part of the overall game, which contains all the elements of a

14    big-budget Hollywood action adventure. Based solely on Activision's creative, ***in-***

15    ***game*** depiction of Delta Force and the MW3 Delta Logo, NovaLogic has sued

16    Activision for trademark infringement and false designation of origin. NovaLogic

17    also has sued Activision's licensees, including the publishers of an MW3 strategy

18    guide and the makers of MW3-branded XBox consoles and headsets. This Motion

19    addresses NovaLogic's claims against Activision and its licensee Penguin Group

20    (USA), Inc. ("Penguin") arising from the MW3 game and its strategy guide (the

21    "MW3 Guide"). NovaLogic's claims against the other licensee defendants, which

22    also are without merit, will be addressed at a later time.

23       This is the paradigmatic example of a plaintiff improperly attempting to

24    extend purported trademark rights to prevent expression about topics of public

25    interest. Were NovaLogic able to prevent the use of Delta Force and its insignia

26    here, then no person ever could refer to or depict the Delta Force, since it is

27    impossible to accurately do so without using its name and insignia. Such a result

28    would similarly preclude creators of other expressive works (including authors,

artists, and producers of other media) from depicting all manner of real-life persons, organizations, or events.  This would be contrary to the First Amendment and would turn the Lanham Act on its head.  Whether "Delta Force" is an official name or a nickname, whether it refers to what was once (but is no longer) a covert or secret unit, or whether it has been registered as a trademark for certain goods and services is irrelevant.  The world is filled with organizations, events, and places with nicknames that have been used as movie, book, or game titles: "the West Wing," "SWAT," "JAG," "Area 51," and "Scotland Yard" are just a few examples.[1]  All of these words are part of the public discourse, and no person or company can or should be able to prevent others from using these terms, or logos associated with them, to depict or discuss these locations, people, and events.

The law is absolutely clear with respect to the application of the First Amendment to trademark claims such as those asserted by NovaLogic.  Under the well-settled test set forth in <u>Rogers v. Grimaldi</u>, 875 F.2d 994, 999 (2d Cir. 1989), and adopted by the Ninth Circuit in <u>E.S.S. Entertainment 2000 v. Rock Star Videos</u>, 547 F.3d 1095, 1099 (9th Cir. 2008), claims arising from the use of a trademark in an expressive work are completely barred unless the use of the mark has ***no artistic relevance*** to the underlying work whatsoever, or, if it has some artistic relevance, unless it ***explicitly misleads*** as to the source or the content of the work.  NovaLogic cannot meet either prong.  The use of Delta Force and a related insignia undeniably has artistic relevance to a video game depicting the fictional adventures of Delta Force and special forces operatives.  Additionally, even a cursory examination of MW3 and its packaging confirms that the game does not explicitly mislead consumers as to any sponsorship or affiliation with NovaLogic and its legacy titles (many of which are no longer available for standard retail

---

[1]  For example, "Area 51" is the title of a video game franchise and is subject to a trademark registration by Midway Games, but it is a common subject of video games, movies, and other media.  (It appears in "Independence Day," "The X Files," and the video games "Tomb Raider 3" and "Deus Ex.")

purchase).  The words "Delta Force" and the related logo do not appear even once in MW3's packaging.  Claims against Penguin for the depiction of the Delta Force in the MW3 Guide are wholly derivative of those against Activision and thus also fail, for the same reasons.

This Motion should be granted and judgment entered in favor of Activision and Penguin with respect to any claims arising from MW3 and the MW3 Guide.

# I.    STATEMENT OF UNDISPUTED FACTS.

**Delta Force.**  Delta Force, or the "1st Special Forces Operational Detachment – Delta," is a widely known U.S. Army Special Forces unit.  By most accounts, Delta Force was formed in the 1970s and is an elite counter-terrorism unit, specializing in covert missions, such as hostage rescues and raids.  SUF 1. According to books written by former Delta Force members and other accounts, Delta Force was involved in the rescue attempt of American hostages at the U.S. Embassy in Iran in 1979, as well as operations in Grenada, Somalia, Afghanistan, and Iraq.  SUF 2.

Delta Force has been known to the public and referred to by its nickname as early as 1983, when the purported founder of Delta Force, Charlie Beckwith, published the book "Delta Force: The U.S. Counter-Terrorist Unit and the Iran Hostage Mission," detailing the history of the unit and its role in the aborted 1980 mission to rescue American hostages.  SUF 3.  Beckwith's book was issued as a paperback in 1985 and remains in print today.  SUF 10.  The Delta Force unit no longer is kept a secret even by the U.S. military: one military-associated website offers a 1995 research report discussing the intense Delta Force recruitment process, while another offers a recruitment advertisement for "[t]he 1st SFOD-Delta (*Delta Force*)," described as "the U.S. Army's special operations unit organized for conducting missions that require rapid response with surgical application of a wide variety of unique skills."  SUF 4, 5 (emphasis added).

For more than 20 years (well before NovaLogic's alleged use), Delta Force

1   has been symbolized by its distinctive insignia:  a triangle punctuated by a

2   lightning bolt, with a dagger emblazoned in the center (the "Army Logo").  SUF 6.

3   As one 1994 book reported (four years before NovaLogic's first game): "A visitor

4   can walk into offices of the U.S. Special Operations Command at Tampa and find

5   coffee mugs sporting the secret Delta Force logo: a kelly green triangle inlaid with

6   a white dagger and another gold triangle."  SUF 7.  Many dozens, if not hundreds,

7   of products currently are available for purchase depicting the Army Logo,

8   including mugs, T-shirts, hats, pins, patches, and neckties.  SUF 8.

9       The exploits of Delta Force have been chronicled in dozens of books

10  (including children's books), newspaper articles, magazine articles, and other

11  materials – a great many pre-dating the NovaLogic Games.  SUF 9.  Many of these

12  also reproduced or discussed the Army Logo.  SUF 9.  These include the

13  following:

14      ●    In 1983 (15 years before NovaLogic's first "Delta Force" game),

15  Beckwith released his book "Delta Force."  SUF 10.  In addition to a 1985

16  paperback version, Beckwith's book was reissued in 2000 (as "Delta Force:  The

17  Army's Elite Counterterrorist Unit," now in its 19th printing) and is scheduled to

18  be reissued in May 2013 (as "Delta Force: A Memoir by the Founder of the

19  Military's Most Secretive Special-Operations Unit").  SUF 10.  The Army Logo

20  has been depicted on the front cover of these books since at least 2000.  SUF 10.

21      ●    On June 17, 1991 (seven years before NovaLogic's first "Delta Force"

22  game), Newsweek published a cover story by Douglas C. Waller titled "Secret

23  Warriors," which depicted the Army Logo.  SUF 11.  Three years later (in 1994)

24  Waller authored "Commandos: The Inside Story of America's Secret Soldiers," in

25  which he noted that "the [Delta Force] has been depicted and idolized in at least a

26  dozen movies and books."  SUF 12.

27      ●    In 1992 (six years before NovaLogic's first "Delta Force" game),

28  Special Forces veteran Terry Griswold released "Delta: America's Elite

Mitchell
Silberberg &
Knupp LLP

5114759.12

5

Counterterrorist Force," depicting the Army Logo on its cover.  SUF 13.

●    In 2000, L.H. "Bucky" Burruss, a founding officer of Delta Force, published a novel set during the 1991 Gulf War titled "Heart of the Storm." Burruss noted that the troops comprising "1st Special Forces Operational Detachment – Delta" are "better known throughout the world as Delta Force," and described a "brass medallion … bearing the combat knife and triangular lightning bolt of the Delta Force logo."  SUF 14.

●    In 2002, Representative Frank Wolf put into the United States Congressional Record a Washington Post article referring to the "iconic Delta Force dagger inside a triangular frame…."  SUF 15.

●    In 2002, former Delta Force soldier Eric Haney (who became a writer on "The Unit") authored a book titled "Inside Delta Force: The Story of America's Elite Counterterrorist Unit."  SUF 16.  The Army Logo has been prominently displayed on the cover of the book's paperback edition and also appears as a graphic device in the book's interior.  SUF 16.  Since at least 2006, Haney's personal website has prominently featured the Army Logo.  SUF 16.

●    In 2008, former Delta Force soldier Pete Blaber wrote and published "The Mission, The Men, and Me: Lessons from a Former Delta Force Commander," recounting tales of Delta Force in Colombia, Somalia, Bosnia, Afghanistan, and Iraq.  SUF 17.

●    In 2008, former Delta Force member Dalton Fury wrote "Kill Bin Laden: A Delta Force Commander's Account of the Hunt for the World's Most Wanted Man."  The book's cover displays a "challenge coin" bearing the Army Logo.  SUF 18.  In 2009, the news program "60 Minutes" ran a segment featuring Fury, which displayed the Army Logo.  SUF 19.

All of these publications and other media accounts consistently depict Delta Force as an elite, hand-selected, highly trained group of soldiers that is tasked with performing intensely difficult and specialized operations in some of the most

Mitchell
Silberberg &
Knupp LLP

5114759.12

6

dangerous locations in the world.  They also consistently depict the Army Logo as the symbol of Delta Force.

**Delta Force In Popular Culture.**  The Delta Force unit has been the source of public fascination and achieved a near-mythical status among the American public.  For many years, Delta Force and the Army Logo have been extensively popularized in a variety of fictional and cinematic works.  SUF 20.  Among these is the 1986 Chuck Norris film "The Delta Force."  SUF 21.  "The Delta Force" (released **13 years** before NovaLogic's first "Delta Force" game) tells the story of an airline hostage rescue operation by the Delta Force.  SUF 21.  An "army consultant" reputed to be a former member of the U.S. Special Forces is credited on the film.  SUF 21.  "The Delta Force" not only depicts a fictionalized version of the Delta Force and the phrase "Delta Force," but also displays the Army Logo, even on the side of a U.S. military aircraft at the film's climactic ending.  SUF 22.  "The Delta Force" is reported to have grossed more than $17 million in box office receipts.[2]  SUF 23.  Starting in 1997 (the year before NovaLogic's first "Delta Force" game was released), a series of **five** films featuring Delta Force also was released under the franchise title "Operation Delta Force."  SUF 24.  A film titled "Delta Force One: The Lost Patrol" apparently was released in 2002.  SUF 25.  Additionally, the 2001 Ridley Scott film "Black Hawk Down" (based on the bestselling book), is a depiction of Delta Force in combat during the conflict in Somalia.  SUF 26.

Delta Force and the Army Logo also appear in numerous works of popular fiction.  SUF 27.  Former Delta Force soldier Dalton Fury has written at least two "Delta Force" novels, the covers of which depict the triangle/lightning bolt portion of the Army Logo.  SUF 28.  Published in 1991 (seven years before NovaLogic's first "Delta Force" game), the romance novel "A Dangerous Man" featured a main

---

[2]  "The Delta Force" was followed by "Delta Force 2" (1990) and "Delta Force 3" (1991).  SUF 23.

Mitchell
Silberberg &
Knupp LLP

5114759.12

1  character from Delta Force: the book describes the Army Logo shown on a wooden

2  plaque, consisting of a "sword, blade pointed up, overlaid with a triangle …

3  formed by a lightning bolt." SUF 29.  Romance novelist Alexis Grant has

4  authored two novels in a "Men of Delta Force" series.  SUF 30.  Other novels that

5  depict or discuss Delta Force are "Deception Point" by Dan Brown, "Rainbow Six"

6  by Tom Clancy, "The Athena Project" by Brad Thor, "A Mission for Delta" by

7  L.H. Burruss, and "Ice Hunt" by James Rollins.  SUF 31.  Delta Force also appears

8  in or is referenced in board games, tabletop role-playing games, and several video

9  games, including the video games "Crysis," "Shadow Ops: Red Mercury," "Act of

10  War: High Treason," and "Spec Ops: The Line."  SUF 32.

11      **The NovaLogic Games.**  In or about 1998, NovaLogic released and

12  marketed the first of a series of military-themed video games, titled "Delta Force."

13  SUF 33.  NovaLogic has admitted and acknowledged that this game was based

14  upon the activities of the U.S. Army's Delta Force unit, which NovaLogic admitted

15  was "created in 1979, modeled after the British Special Air Service (SAS)," and is

16  a "highly secretive unit [designed] to serve as an overseas Commando and

17  Counter-Terrorist unit which specialized in Hostage rescue, barricade operations

18  and the nation's most sensitive military operations…."  SUF 34.  "Delta Force"

19  was advertised and marketed as depicting the "real U.S. Army Delta Force" and as

20  including "military simulation features so players will feel as if they are actual

21  members of Delta Force." [3]  SUF 35.  NovaLogic touted that it relied on the advice

22  of a "former Delta Force Assault Troop Commander" or "Former Delta Force

23  Officer" to imbue the game with "true characteristics of a Delta Force soldier."

24  SUF 36.

25      NovaLogic released a number of sequels to "Delta Force."  SUF 38.  Like

26  the original 1998 game, the subsequent NovaLogic Games consistently represented

27

---

[3]  In its responses to Defendants' Requests for Admissions, NovaLogic admitted
that it used the term "Delta Force" to "depict what it believed was an unofficial and
mysterious unit of the United States Army."  SUF 37.

28

that they were based on the "real Delta Force unit." SUF 39. They stated in their packaging, for example, that the player can "take control of the US Army's elite anti-terrorist unit" (for "Delta Force: Land Warrior"); that "[y]ou're a member of the U.S. Army's best-kept secret: the elite SPECIAL OPERATIONS unit known as Delta Force, formed to BATTLE TERRORISM throughout the world" (for "Delta Force 2"); that "[a]s the US army's elite special operations soldiers you are the most potent 'smart weapon' known to man" (for "Delta Force: Task Force Dagger"); that "[a]s a Delta Force operative you participate in a number of daring and intense raids against the oppressive Somali warlords in and around Mogadishu" (for "Delta Force: Black Hawk Down"); and that "[a]s part of Delta Force, the U.S. Army's most secretive and highly trained unit, you have the skills and the firepower to hunt them down and take them out" (for "Delta Force: XTreme 2"). SUF 40, 41, 42, 43. Similar statements were made on NovaLogic's official website and in press releases, such as a 1999 statement on NovaLogic's website that "Delta Force" is based on "actual events" and on "missions [that] real Delta Force operators would be employed to do," and a 2001 press release acknowledging that "[t]he real Delta Force unit, on which the [Delta Force] games franchise is based, was originally created in 1979...." SUF 44, 45.

The NovaLogic Games have been marketed using the Army Logo or a close variant thereof (the "NovaLogic Delta Logo"). SUF 46. Like the Army Logo, the NovaLogic Delta Logo contains a triangle punctuated by a lightning bolt with an upright dagger in the center. SUF 47. NovaLogic admitted that it did not independently create the NovaLogic Delta Logo, but that it was derived from a pre-existing design (namely, the Army Logo) provided to NovaLogic. SUF 48. On the NovaLogic website, the NovaLogic Delta Logo is featured as one of a set of "Soldier Profiles" for ten celebrated and actually existing organizations around the world (including not only Delta Force, but also the Green Berets, the CIA, and the British SAS), each describing the organization alongside a depiction of its

1   associated real-life insignia.  SUF 49.

2       **Activision and "Call of Duty."**  Activision is a video game publisher,

3   engaged in the business of developing, financing, producing, marketing, and

4   distributing video games, including the "Call of Duty" series of video games.  SUF

5   51, 52.  The "Call of Duty" games are military action/military fantasy games, in

6   which the player assumes control of a military soldier and fights against computer-

7   or human-controlled opponents across a variety of computer-generated battlefields.

8   SUF 52.  The original "Call of Duty" was released in 2003, and was followed by

9   "Call of Duty 2" in 2005 and "Call of Duty 3" in 2006.  SUF 53.  In 2007,

10  Activision released the first of its "Call of Duty: Modern Warfare" series of games

11  ("Call of Duty 4: Modern Warfare").  SUF 53.  Activision subsequently released

12  "Call of Duty: Modern Warfare 2" in 2009 and "Call of Duty: Modern Warfare 3"

13  ("MW3") in 2011.  SUF 53.  The "Call of Duty: Modern Warfare" games take

14  place in the near-future and place players in the role of modern-day soldiers

15  involved in high-risk combat operations throughout the world.  SUF 54.

16      **MW3.**  MW3 was released in 2011.[4]  SUF 56.  MW3 is a military action

17  adventure that takes place in the year 2016.  In this hypothetical near-future, the

18  U.S. is at war with Russia and World War III is imminent.  Meanwhile, a terrorist

19  group, led by villain Vladmir Makorov, has obtained access to Russian nuclear

20  weapons and threatens to destroy the Western world.  MW3 tells the story of a

21  group of elite international soldiers tasked with a variety of high-risk missions to

22  save the world and stop Makorov, such as securing a radio tower in New York,

23  rescuing the U.S. vice president in Germany, infiltrating a hotel in Prague,

24  stopping a kidnapping plot in Siberia, and ultimately capturing Makorov in the

25  Arabian Peninsula.  SUF 57.

26      MW3 is a fully cinematic experience, featuring story, dialog, music, special

27

28  ---
[4] Defendants are lodging with the Court a retail copy of the XBox 360 version of MW3 and will provide the Court with a functioning XBox 360 console. Defendants are also providing to the Court a DVD containing footage from MW3.

effects, and all of the other elements one would expect from a big-budget entertainment franchise.  SUF 58.  Within that experience, MW3 realistically and convincingly portrays modern combat operations.  SUF 59.  Weapons generally are as faithful as possible to their real-world counterparts.  Locations around the world (such as New York and Paris) are rendered in detail and are readily identifiable (e.g., by using landmarks modeled to look like the real New York Stock Exchange and the Eiffel Tower).  Real-world vehicles are used.  The names and logos of actual combat forces and troops are used, such as the U.S. Army Rangers and the British SAS.  SUF 59.  As one author commented:  "[M]aybe the most compelling and wide-reaching depictions of special ops today are not in movies or TV but in that 21st-century medium, the first-person shooter videogame – like the Call of Duty series (*Modern Warfare* and *Black Ops*)…."  SUF 55.

Like other games in the "Call of Duty" series, the single-player campaign of MW3 is divided into discrete "missions" or "levels," and the player's perspective shifts between a few main characters from mission to mission.  SUF 60.  MW3's main characters are special forces operatives, including members of the United States Delta Force, members of the British SAS, and agents of the Russian FSO.  Each of these characters plays a part in the overall story, which unfolds during the course of the game.  SUF 61.

In seven out of 16 missions, MW3 players play a member of a Delta Force team.  These missions include an assault on the New York Stock Exchange, a fight on the streets of Paris, and a rescue operation of the Russian president in a Siberian diamond mine.  SUF 62.  Delta Force first is introduced in a mission titled "Black Tuesday."  In the introductory sequence to that mission, senior Department of Defense officials explain that the Russians are jamming a satellite signal and then use satellite imaging to analyze which U.S. military units are closest to the jamming tower.  After reviewing the locations of the Army Ranger, Marines, and Delta Force teams, the U.S. Central Command contacts the Delta Force team and

1   instructs its commander, Sgt. Derek Frost, to disable the tower.  Players then take

2   control of Frost and lead him and his team to their objective.  SUF 63.

3          Before each MW3 mission, the player is given a mission briefing, and then

4   the logo of the special forces unit featured in the upcoming mission is displayed.

5   SUF 64.  Each special forces unit has its own unique circular logo, derived from

6   the actual military logos used by or associated with the unit.  For example, the

7   Russian FSO logo is a red star with the Soviet hammer-and-sickle inside, and the

8   British SAS logo is a set of wings with a downward-pointed dagger in the center.

9   SUF 64.  At the start of each mission, the game displays the mission's title, the

10  date and time, the name of the soldier the player is about to assume control of, the

11  special forces team involved, and the mission's location.  SUF 65.  Consistent with

12  this convention, before missions featuring Frost and his Delta Force unit, a Delta

13  Force logo (the "MW3 Delta Logo") is briefly displayed.  SUF 66.  The MW3

14  Delta Logo comprises a triangle punctuated by a lightning bolt, with an upright

15  knife in the center of the triangle, encased within a circle bearing the words "Delta

16  Force – United States Army."  SUF 67.  The MW3 Delta Logo (depicted below)

17  evokes the Army Logo (also depicted below) but modifies the design in some

18  respects, including by repositioning the triangle lightning-bolt, changing the shape

19  of the knife, and including the words "**Delta Force – United States Army** " along

20  the edge of the seal.  SUF 67, 68.

      

**MW3 Delta Logo**          **Army Logo**

28  The words "Delta Force" and the MW3 Delta Logo appear, in total, for only a few

Mitchell
Silberberg &
Knupp LLP

5114759.12

12

1  minutes of the 7-8 hour campaign experience.  SUF 69.

2       In addition to the single-player, story-driven campaign, MW3 includes a

3  multiplayer mode, in which the player joins a special forces team and fights against

4  or alongside other players within a computer-generated battlefield (or "map").

5  SUF 70.  MW3 shipped with 16 multiplayer maps, each of which pits two military

6  units against each other.  SUF 71.  The special forces teams available to players in

7  each match are pre-designated and based logically upon the nature and location of

8  the map (and, in some cases, based on the map's relationship to the single-player

9  story).  For example, the "Bakaara" map, which depicts an African city, pits the

10  "Africa Militia" against the "PMC" (Private Military Company).  SUF 71.  When a

11  player joins a multiplayer match, he or she is assigned to a team, while a screen

12  displays a list of the teams and their logos, along with the names of the players

13  who have selected each team.  SUF 72.  At the start of the match, the name of the

14  player's team and its logo is displayed again (to remind players which team they

15  are on).  At the end of the match, the names and logos of the two teams again are

16  displayed, along with the final score for the match.[5]  SUF 72.

17       Seven multiplayer maps place the Delta Force against the Russian Spetsnaz

18  (special forces).  SUF 73.  These maps generally depict locations that are related to

19  U.S./Russian conflicts in the single-player campaign, such as New York City,

20  Europe, and Siberia.  SUF 73.  Like the other multiplayer maps, these seven maps

21  display the teams' names and logos – i.e., the words "Delta Force" and the MW3

22  Delta Logo and the Russian Spetsnaz name and logo – during the matchmaking

23  process and at the end of the match as part of the scoreboard.  SUF 73.  If the

24  player has elected to play on the Delta Force team, the words "Delta Force" and

25  the MW3 Delta Logo are displayed at the beginning of the match.  (By contrast, if

26

27  _____

28  [5]  In certain game types, flags and weapons appear on the battlefield that bear the insignia of the two competing teams.  Additionally, in a multiplayer mode called "Special Ops," the player can call in computer-controlled Delta Force teammates to assist on the battlefield.  SUF 72.

Mitchell
Silberberg &
Knupp LLP

5114759.12

13

1    the player has elected to play on the Spetsnaz team, the word "Spetsnaz" and

2    accompanying logo are displayed.)  SUF 73.  The words "Delta Force" and the

3    MW3 Delta Logo appear for only a very short time in connection with each

4    multiplayer match.  SUF 74.

5        The words "Delta Force" and the MW3 Delta Logo are not used in MW3's

6    title, on the game's packaging, or in advertisements for the game.  SUF 76.

7        **The MW3 Guide.**  BradyGames  ("Brady"), a division of Penguin, is a

8    publisher of high-quality video game strategy guides.  SUF 82.  In 2011, pursuant

9    to a license from Activision, Brady published the "BradyGames Signature Series

10   Guide" for MW3 (the "MW3 Guide").  SUF 83.  The MW3 Guide is a 350-page

11   book featuring a detailed walkthrough of the game, including illustrations of maps,

12   lists of objectives, tactics and strategies, weapon statistics, the locations of objects

13   and hidden items, and thousands of in-game screenshots.  SUF 84.  The only use of

14   the words "Delta Force" and the MW3 Delta Logo in the MW3 Guide is in the

15   description of each of the Delta Force missions: beneath the title of the mission is a

16   small image of the MW3 Delta Logo and the words "Delta Force." [6]  The words

17   "Delta Force" and the MW3 Delta Logo appear on six pages of the 350-page

18   guidebook, and the single word "Delta" appears on seven pages.  SUF 84, 85.

19       **The Lawsuit.**  On May 10, 2012, NovaLogic filed its Complaint against

20   Activision and Brady, along with two Activision licensees, Microsoft Corporation

21   and Voyetra Turtle Beach, Inc.  The Complaint alleges three federal Lanham Act

22   claims against Defendants:  for infringement of a registered mark (15 U.S.C.

23   § 1114), for false designation of origin (15 U.S.C. § 1125(a)), and for contributory

24   trademark infringement, along with a state law claim for common law trademark

25   infringement.

26

27
_____

28   [6] The back cover of the MW3 Guide depicts a sample page from the book
reflecting one of the Delta Force missions, but the logo is barely identifiable.  SUF 87.

Mitchell
Silberberg &
Knupp LLP

5114759.12

## II.    THE LEGAL STANDARD.

"In cases involving free speech, a speedy resolution is desirable because protracted litigation may chill the exercise of First Amendment rights.  For that reason, summary judgment is a favored remedy in free speech cases." <u>Kirby v. Sega of Am., Inc.</u>, 144 Cal. App. 4th 47, 54 (2006).  Courts thus routinely grant summary judgment for the defendant in cases involving the interplay of the Lanham Act and the First Amendment.  <u>See</u>, <u>e.g.</u>, <u>E.S.S. Entm't 2000 v. Rock Star Videos</u>, 547 F.3d 1095, 1099 (9th Cir. 2008) (affirming summary judgment for defendant); <u>Roxbury Entm't v. Penthouse Media Grp.</u>, 669 F. Supp. 2d 1170, 1172 (C.D. Cal. 2009) (summary judgment for defendant).  Here, the parties' products speak for themselves, there are no disputed material facts, and judgment is warranted as a matter of law on Activision and Brady's First Amendment defense.[7]

## III.    THE FIRST AMENDMENT BARS NOVALOGIC'S CLAIMS ARISING FROM THE USE OF DELTA FORCE AND THE MW3 DELTA LOGO IN MW3.

"'Trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view.'" <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 900 (9th Cir. 2002) (<u>quoting</u> <u>L.L. Bean, Inc. v. Drake Publishers, Inc.</u>, 811 F.2d 26, 29 (1st Cir. 1987)).  "Were [courts] to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment." <u>MCA</u>, 296 F.3d at 900.  Thus, "[t]he First Amendment can provide a complete defense to Lanham Act claims involving artistic works." <u>Roxbury</u>, 669 F. Supp. 2d at 1175.

It now is beyond dispute that video games such as MW3 are core speech

---

[7]  No factual discovery is required to decide this Motion, which is based on the products at issue and the manner in which the trademarks are used.  The defendants' knowledge or intent is irrelevant.  <u>See</u> <u>Dillinger LLC v. Elec. Arts Inc.</u>, No. 09-cv-1236, 2011 WL 2457678, at *6 (S.D. Ind. June 16, 2011) (reasons why Dillinger name was used in video game were irrelevant).  <u>Accord</u> <u>Brownmark Films, LLC v. Comedy Partners</u>, 682 F.3d 687, 690 (7th Cir. 2012) (to decide analogous copyright fair use defense, "the only two pieces of evidence needed to decide the question of fair use" were the plaintiff's and defendant's works).

protected by the First Amendment, just as are books, plays, and movies.  As explained by the Supreme Court in <u>Brown v. Entertainment Merchants Association</u>, 131 S. Ct. 2729, 2733 (2011):

> Like the protected books, plays, and movies that preceded them, video games communicate ideas – and even social messages – through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world).  That suffices to confer First Amendment protection…. [W]hatever the challenges of applying the Constitution to ever-advancing technology, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary" when a new and different medium for communication appears.

<u>See also</u> <u>Kirby</u>, 144 Cal. App. 4th at 58 ("Video games are expressive works entitled to as much First Amendment protection as the most profound literature."); <u>Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.</u>, 329 F.3d 954, 957 (8th Cir. 2003) ("If the First Amendment is versatile enough to 'shield [the] painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll,' we see no reason why the pictures, graphic design, concept art, sounds, music, stories, and narrative present in video games are not entitled to similar protection.").  Certainly MW3, with its compelling narrative, distinctive characters, and rousing music, is entitled to as much protection as any motion picture, television show, or novel.  <u>See Brown v. Elec. Arts, Inc.</u>, No. 2:09-CV-01598-FMC, 2009 WL 8763151, at *4 (C.D. Cal. Sept. 23, 2009) ("The Madden NFL video games are expressive works, akin to an expressive painting that depicts celebrity athletes of past and present in a realistic sporting environment.")

In order to ensure that the "the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond the source-identifying function," <u>MCA</u>, 296 F.3d at 900, courts in this circuit evaluate trademark claims involving expressive works using the test articulated in <u>Rogers v. Grimaldi</u>, 875 F.2d 994, 999 (2d Cir. 1989).  In <u>Rogers</u>, the

Mitchell
Silberberg &
Knupp LLP

5114759.12

16

1  Second Circuit Court of Appeals dismissed on First Amendment grounds claims by

2  the estate of Ginger Rogers against the producers and distributors of a film titled

3  "Ginger and Fred" about the reunion of two fictional cabaret performers.  In its

4  ruling, the Second Circuit recognized and articulated the need for narrow

5  construction of the Lanham Act to avoid a conflict with First Amendment values,

6  even if the use of the trademark might result in some consumer confusion.  Id. at

7  1000 ("[T]he slight risk that such use of a [trademark] might implicitly suggest

8  endorsement or sponsorship to some people is outweighed by the danger of

9  restricting artistic expression, and the Lanham Act is not applicable.").  It thus

10  crafted a specific test to govern these types of situations.

11     Under the two-part Rogers test, claims for the use of trademark in an

12  expressive work can succeed only if the "public interest in avoiding consumer

13  confusion *outweighs* the public interest in free expression."  E.S.S., 547 F.3d at

14  1099 (quoting Rogers, 875 F.2d at 999).  Specifically, "[a]n artistic work's use of a

15  trademark that otherwise would violate the Lanham Act is not actionable 'unless

16  [1] the [use of the mark] has no artistic relevance to the underlying work

17  whatsoever, or, [2] if it has some artistic relevance, unless [it] explicitly misleads

18  as to the source or the content of the work.'"  E.S.S. 547 F.3d at 1099 (quoting

19  MCA, 296 F.3d at 902).  Rogers has been adopted as the law in the Ninth Circuit,

20  and it has been applied to a wide variety of expressive works, including video

21  games, sound recordings, photographs, and motion pictures.  See E.S.S., 547 F.3d

22  at 1095 (video game); Mattel Inc. v. Walking Mountain Prod., 353 F.3d 792, 807

23  (9th Cir. 2003) (artistic photographs); MCA, 296 F.3d at 902 (popular song).

24     As a matter of law, NovaLogic cannot satisfy either prong of the Rogers test.

25  This case in fact is the paradigmatic example of a purported trademark owner

26  attempting to quash free expression through inappropriate and overreaching claims

27  of exclusivity over historical or real-world names and logos that are part of the

28  public discourse and that have acquired independent meaning.

Mitchell
Silberberg &
Knupp LLP

5114759.12

17

### A.   The Delta Force And MW3 Delta Logo Have Clear And Direct Artistic Relevance To MW3.

It is well established in this circuit that only the use of a trademark with "'***no artistic relevance*** to the underlying work ***whatsoever***'" does not merit First Amendment protection. E.S.S., 547 F.3d at 1100 (quoting Rogers, 875 F.2d at 999) (emphases added).  In other words, "[t]he level of relevance merely must be ***above zero***." E.S.S., 547 F.3d at 1100 (emphasis added).  See also Roxbury, 669 F. Supp. 2d at 1175-76 (same).  There is good reason for this lenient standard: "It is not the role of the Court to determine how meaningful the relationship between a trademark and the content of a literary work must be." Dillinger LLC v. Elec. Arts Inc., No. 09-cv-1236-JMS-DKL, 2011 WL 2457678, at *6 (S.D. Ind. June 16, 2011).  Were it otherwise, the court would be required to make subjective artistic judgments or to evaluate the merits and purposes of a creative work.  See, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 582 (1994) ("As Justice Holmes explained, '[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits.'") (quoting Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903)); Walking Mountain, 353 F.3d at 801 (citing same).

The artistic relevance of the use of Delta Force and the MW3 Delta Logo is not merely "above zero" – it is obvious and indisputable.  MW3 is about special forces military operations, and more specifically is about elite anti-terrorist forces engaged in high-risk anti-terrorist missions and other military combat operations.  Because MW3 takes place around the world and enables players to assume control of a variety of elite international soldiers, it is natural and logical that the U.S. soldiers are Delta Force, just as the British soldiers are SAS and the Russian soldiers are Spetsnaz.  In fact, the precise and discrete missions engaged in by Delta Force in MW3 are exactly the types of missions that the actual Delta Force

1    trains for and is known for.  Like the real Delta Force soldiers, MW3's Delta Force

2    soldiers carry a variety of specialized weapons and explosives.  Like real Delta

3    Force missions, MW3's Delta Force missions are precise and discrete, such as

4    disabling radio towers, rescuing hostages, and providing advance reconnaissance

5    so that ordinary troops can perform their operations.  It is integral to the military

6    fantasy presented by MW3 that players are able to play as members of this elite

7    team, both as part of the single-player story experience and as part of the

8    competitive multiplayer game.  See, e.g., Brown, 2009 WL 8763151, at *4 (use of

9    professional football players was relevant to game involving competitive football

10   matches).

11          Nor can there be any serious dispute as to the artistic relevance of a Delta

12   Force logo in MW3, whether it be the Army Logo or the MW3 Delta Logo.  The

13   dagger, triangle, and lightning bolt is synonymous with the Delta Force army unit.

14   See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 309 (4th Cir.

15   2010) ("A logo is an identifying symbol").  That is why it is used on the cover of

16   books about the Delta Force and available for purchase on T-shirts, coffee mugs,

17   patches, and other merchandise.  MW3 is filled with logos and symbols, including

18   the logos of military special ops units (such as the SAS and Task Force 141), the

19   logos of government branches such as the Department of Defense, and well-known

20   symbols such as the international symbols for biohazard or nuclear materials.  SUF

21   75.  Certainly, the use of realistic logos and emblems is an artistic and aesthetic

22   decision that is beyond the minimal, "above zero" threshold required by Rogers.

23          A number of recent cases (including two dealing directly with video games)

24   are directly on point.  In E.S.S., 547 F.3d at 1095, the Ninth Circuit evaluated

25   trademark claims brought by the owner of a strip club ("The Play Pen") arising

26   from the use of a similar name and logo ("The Pig Pen") for a fictional strip club in

27   the video game "Grand Theft Auto: San Andreas."  Applying Rogers, the court

28   held that the use of the plaintiff's trademark was artistically relevant to the

1  defendant's vision in re-creating a virtual, cartoonish depiction of portions of real-

2  life Los Angeles.  Id. at 1099-1100.  The court also noted that for purposes of

3  Rogers it was irrelevant that the Play Pen was not "iconic," that the game was not

4  "about" the Play Pen, or that the game could have been made without using the

5  Play Pen name and logo.  Id. at 1100.  Rather, the use was relevant to

6  "develop[ing] a cartoon-style parody of East Los Angeles" and, more specifically,

7  to "recreat[ing] a critical mass of the businesses and buildings," and creat[ing] the

8  distinctive "look and feel" of East Los Angeles.  Id.  The rationale of E.S.S. applies

9  even more forcefully here because, unlike the Play Pen, Delta Force and the Army

10  Logo *are* "iconic," MW3 is in part "about" Delta Force, and Delta Force plays an

11  integral role in MW3.  See, e.g., Brown, 2009 WL 8763151, at *4 (image and

12  likeness of football player was artistically relevant to NFL game).

13      In Roxbury, 669 F. Supp. 2d at 1172, the plaintiff was the owner of a

14  trademark for "Route 66" in connection with entertainment content, including

15  "episodes of the original 'Route 66' television programs, remakes, sequels, feature

16  film adaptations, and related merchandise."  Notwithstanding the plaintiff's

17  registered trademarks, the defendant released an explicit adult film *titled* "Route

18  66," primarily comprising explicit sex scenes but with a nominal plot of a couple

19  "on the run."  Id. at 1172-73.  Even that minimal and highly tenuous relationship

20  between the "Route 66" trademark and the film was sufficient to satisfy the first

21  prong of the Rogers test.  Id. at 1176 ("Defendants have introduced evidence

22  demonstrating at least some relationship between the mental imagery associated

23  with the term 'Route 66', e.g., road trips, cross-country travel, and the content of

24  Defendants' movie.  Plaintiffs' argument that the association is tenuous does not

25  controvert Defendants' showing.").

26      Also analogous is Dillinger, 2011 WL 2457678, at *5, in which the owner of

27  rights in the name and likeness of gangster John Dillinger alleged that the

28  "Dillinger" trademark was infringed by its use as the name of a Tommy Gun in a

video game.  Applying <u>Rogers</u> and <u>E.S.S.</u>, the court found that use of the Dillinger name to describe the gun was artistically relevant, irrespective of how "attenuated" the use might have been to the theme and purpose of the game, and irrespective of the fact that the game could have been made without using the "Dillinger" name:

> As was the case in <u>E.S.S.</u>, even if the Court accepts the characterization as attenuated, such connection is enough to satisfy the <u>Rogers</u> test: The gentleman-bandit, commonly known for his public persona as a "flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns," has above-zero relevance to a game whose premise enables players to act like members of the mafia and spray Tommy Guns.

Numerous courts, including the Ninth Circuit Court of Appeals, have come to the same or similar conclusions, finding that the first prong of <u>Rogers</u> was satisfied in circumstances where the use was far more significant (such as in the title of the work) or where the "artistic relevance" of the use was far more attenuated than it is here.  <u>See, e.g., Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.</u>, 868 F. Supp. 2d 172, 178-79 (S.D.N.Y. 2012) (use of a "knock-off" Louis Vuitton bag in "The Hangover 2"); <u>MCA</u>, 296 F.3d at 894 (use of "Barbie" trademark in a song titled "Barbie Girl"); <u>Winchester Mystery House, LLC v. Global Asylum, Inc.</u>, 210 Cal. App. 4th 579, 590 (2012) (use of "Winchester Mystery House" trademark in the title of a motion picture); <u>Capcom v. MKR Grp.</u>, No. C 08-0904 RS, 2008 WL 4661479, at *13 (N.D. Cal. Oct. 20, 2008) (use of plaintiffs' trademark "Dead" as the title of a game about zombies).  In fact, the First Amendment defense is even stronger (and more important) here than in all of the above cases, because Delta Force and its insignia have a preexisting and widespread meaning and significance that is wholly independent from the purported designation of NovaLogic's goods and services.

**B.  <u>The Use Of Delta Force And The MW3 Delta Logo In MW3 Does Not Expressly Mislead As To NovaLogic's Sponsorship Or Endorsement.</u>**

"To be 'explicitly misleading,' the defendant's work must make some

1     ***affirmative statement*** of the plaintiff's sponsorship or endorsement, beyond the

2     mere use of plaintiff's name or other characteristic." <u>Dillinger</u>, 2011 WL 2457678,

3     at *6 (emphasis added) (<u>citing</u> <u>Rogers</u>, 875 F.2d at 1001). NovaLogic ***admits*** that

4     Activision did not explicitly misrepresent or in any manner affirmatively state to

5     the public that NovaLogic is associated with, sponsored, endorsed, or otherwise is

6     the source of MW3. SUF 77. (Nor would there be any logical reason for

7     Activision to do so, since the "Call of Duty" titles have been hugely popular for

8     years.) This fact is dispositive, because the "mere use, without more, is

9     insufficient to make the use explicitly misleading." <u>Roxbury</u>, 669 F. Supp. 2d at

10     1176; <u>see also</u> <u>E.S.S.</u>, 547 F.3d at 1100 (same); <u>Dillinger</u>, 2011 WL 2457678, at *8

11     ("Plaintiff points to no *explicit* misrepresentation – that fact alone is dispositive of

12     this issue.").[8]

13         In any event, a review of MW3 confirms that nothing within the game or its

14     packaging explicitly misleads as to any sponsorship or endorsement by NovaLogic.

15     No reference is made in MW3 (or any MW3 materials) to NovaLogic or any of its

16     games. SUF 88. MW3 does not purport to be a sequel, remake, or reimagining of

17     NovaLogic's "Delta Force" games. SUF 78. MW3 does not claim or suggest in

18     any manner that it was made with the participation or endorsement of NovaLogic.

19     SUF 79. <u>See</u> <u>Rogers</u>, 875 F.2d at 999 (giving as examples of "explicit"

20     endorsement the phrases "an authorized biography" or "Jane Fonda's Workout.")

21     MW3 does not even once use the words "Delta Force" or any version of the Army

22     Logo or MW3 Delta Logo on the game's packaging or in any advertising for the

23

---

24     [8] As noted, whether some consumers might mistakenly believe (which NovaLogic has failed to demonstrate) that some relationship exists between Activision and

25     NovaLogic as a result of the use is irrelevant. <u>See</u> <u>Rogers</u>, 875 F.2d at 1001 ("To the extent that there is a risk that the title will mislead consumers as to what the

26     work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression."); <u>Louis Vuitton</u>,

27     868 F. Supp. 2d at 184 ("Even assuming, *arguendo*, that Louis Vuitton could state a cognizable claim of confusion, Warner Bros' use of the Diophy bag is protected

28     under <u>Rogers</u> because it has some artistic relevance to the Film and is not explicitly misleading.").

1   game.  SUF 76.  See Brown, 2009 WL 8763151, at *5 ("The character, and

2   Brown's name, are not depicted on the games' packaging or in their advertising.").

3   Thus, it is no surprise that NovaLogic has admitted that it has no evidence that

4   anyone purchased MW3 mistakenly believing that it was somehow affiliated with

5   NovaLogic's "Delta Force" games.  SUF 90.  NovaLogic also has not produced

6   any evidence that any consumer was misled by Activision into believing that

7   NovaLogic was the source of MW3 or was affiliated with or sponsored the game.

8   SUF 90, 91.  See Dillinger, 2011 WL 2457678, at *7 ("[D]espite Plaintiff's

9   sweeping allegation, it has presented no evidence that a single consumer was

10  misled in this case.").

11          Moreover, a variety of facts and factors *affirmatively negate* the possibility

12  that MW3 explicitly misleads.  Delta Force and its insignia have a prior meaning

13  and connotation (namely, as an army unit) that has nothing at all to do with

14  NovaLogic.  Moreover, the MW3 Delta Logo is *different* from the Army Logo and

15  the NovaLogic Delta Logo, including because (unlike the Army Logo), it contains

16  an express reference to the *U.S. Army*.  SUF 68.  MW3's packaging also is clear as

17  to its origin and source.  It prominently displays the title "CALL OF DUTY:

18  MW3."  It identifies its makers as "Activision" and its affiliated studios "Infinity

19  Ward" and "Sledgehammer Games."  SUF 80.  See Winchester, 210 Cal. App. 4th

20  at 592 (back cover of film displayed defendant's name and identified the film as a

21  "MARK ATKINS" film).  It also explicitly references the earlier "Call of Duty:

22  Modern Warfare Games," touting that "The Best-Selling Franchise in XBox 360

23  History Is Back."  SUF 81.  By contrast, each of the NovaLogic Games

24  prominently displays the title "DELTA FORCE" (in all capital letters), followed

25  by the subtitle (e.g., "Xtreme," "Urban Warfare") and prominently identifies

26  NovaLogic as the publisher.  SUF 50.  See Cliffs Notes Inc. v. Bantam Doubleday

27  Dell Publishing Grp., Inc., 886 F.2d 490, 492 (2d Cir. 1989) (noting "important

28  differences" between plaintiff's and defendant's books, focusing on their covers).

Mitchell
Silberberg &
Knupp LLP

5114759.12

23

1  MW3 thus is plainly identified as an installment in Activision's "Call of Duty"

2  series, rather than the latest installment in NovaLogic's "Delta Force" series, and

3  there is no basis to conclude that Activision's use of the mark is "'duping'

4  consumers into thinking that they are buying a product sponsored by, or in any way

5  affiliated with" NovaLogic. Roxbury, 669 F. Supp. at 1176.

6  **IV.  NOVALOGIC'S CLAIMS AGAINST BRADY ALSO ARE BARRED**
7  **BY THE FIRST AMENDMENT.**

8       The MW3 Guide is a faithful and detailed description of the contents of

9  MW3. SUF 83, 84. NovaLogic's claims arising from the MW3 Guide are entirely

10  derivative of those arising from the MW3 video game, and fail for the same

11  reasons. See Kirby, 144 Cal. App. 4th at 52 (dismissing claims arising from use of

12  allegedly infringing image in video game strategy guide).

13       *First*, the use of the words "Delta Force" and the MW3 Delta Logo to

14  describe the MW3 missions in which the Delta Force team stars plainly is

15  artistically relevant to the book. Indeed, it would be impossible to accurately

16  describe the Delta Force MW3 missions without referencing Delta Force. The

17  MW3 Delta Logo is depicted only inside the MW3 Guide, only on a few pages

18  (2%) of the 350 page book, only in connection with the Delta Force missions, and

19  only as very small icon, serving a descriptive function. SUF 85. It is used

20  logically and artfully in the context of the book. SUF 86.

21       *Second*, the use does not explicitly mislead as to any affiliation with

22  NovaLogic. Like MW3, the MW3 Guide does not use the words "Delta Force" or

23  the MW3 Delta Logo on its cover. See Brown, 2009 WL 8763151, at *5. It does

24  not reference NovaLogic or its "Delta Force" franchise; nor does it suggest any

25  affiliation or relationship with NovaLogic. Exactly the opposite: the MW3 Guide

26  clearly identifies that it is a guide for MW3, contains the MW3 cover image on its

27  cover, and prominently displays the "Activision," "Infinity Ward," and

28  "Sledgehammer Games" names and logos on its front and back covers. SUF 89.

Mitchell
Silberberg &
Knupp LLP

5114759.12

24

Accordingly, as is the case for MW3 itself, it would be illogical to conclude that the MW3 Guide ***explicitly misleads*** consumers.

## V. NOVALOGIC'S CLAIM FOR "COMMON LAW TRADEMARK INFRINGEMENT" ALSO FAILS.

NovaLogic's Fourth Cause of Action for "Common Law Trademark Infringement" appears to be a California law claim (NovaLogic is seeking punitive damages under Cal. Civ. Code § 3294). This claim is premised on the exact same facts as Plaintiff's analogous Lanham Act claims. See Complaint, ¶¶ 57-59 (incorporating earlier allegations and alleging that all damages are "by reason of the Defendants' actions alleged herein"). Accordingly, these claims similarly fail under the First Amendment Rogers test. See E.S.S., 547 F.3d at 1101 ("Since the First Amendment defense applies equally to [plaintiff's] state law claims as to its Lanham Act claim, the district court properly dismissed the entire case on [defendant's] motion for summary judgment."); Walking Mountain, 353 F.3d at 816 (affirming summary judgment on all trademark-related claims).

## Conclusion

For the foregoing reasons, this Motion should be granted and judgment entered on all of NovaLogic's claims against Activision and Brady arising from MW3 and the MW3 Guide.

DATED: March 14, 2013

KARIN G. PAGNANELLI
MARC E. MAYER
GILBERT LEE
MITCHELL SILBERBERG & KNUPP LLP

By: /s/ Marc E. Mayer
Marc E. Mayer
Attorneys for Defendants