**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES -- GENERAL**</u>

| | |
|---|---|
| Case No.   **CV 12-4011-JFW (SHx)** | Date:  June 18, 2013 |

Title:     Novalogic, Inc. -v- Activision Blizzard, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| **Courtroom Deputy** | **Court Reporter** |

| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS):**     ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANTS ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., AND PENGUIN GROUP (USA), INC. [filed 3/14/13; Docket No. 34]

On March 14, 2013, Defendants Activision Blizzard, Inc., Activision Publishing, Inc., and Penguin Group (USA), Inc. filed a Motion for Partial Summary Judgment ("Motion").  On May 23, 2013, Plaintiff Novalogic, Inc. filed its Opposition.  On June 3, 2013, Activision Blizzard, Inc., Activision Publishing, Inc., and Penguin Group (USA), Inc. filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's June 17, 2013 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.     Factual and Procedural Background**

**A.     Procedural History**

On May 10, 2012, Plaintiff Novalogic, Inc. ("Plaintiff") filed this action against Activision Blizzard, Inc. ("Activision Blizzard"), Activision Publishing, Inc. ("Activision Publishing"), Penguin Group (USA), Inc. ("Penguin"), Microsoft Corporation, and Voyetra Turtle Beach Inc. ("Turtle Beach").  In its Complaint, Plaintiff alleges four trademark claims: (1) infringement of Plaintiff's registered trademarks (15 U.S.C. §1114); (2) false designation of origin (15 U.S.C. §1125(a)); (3) contributory trademark infringement; and (4) state law common law infringement claim.

The heart of Plaintiff's Complaint is that Activision[1] and its licensees have used Plaintiff's registered trademarks in Activision's hugely successful "Call of Duty – Modern Warfare 3" video game ("MW3") and related products, such as Microsoft Corporation's XBox 360, Turtle Beach's headphones, and DK/BradyGAMES' ("BradyGames")[2] guidebook entitled "BradyGAMES Signature Series Guide for MW3 ("MW3 Guide").

In response to Plaintiff's Complaint, Activision and Penguin[3] have filed a narrowly-tailored Motion seeking summary judgment on all of Plaintiff's claims that arise out of the MW3 video game and the MW3 Guide on the grounds that the First Amendment bars Plaintiff's claims. Simply stated, this Motion asks the Court to determine whether the First Amendment allows Activision and Penguin to the use the phrase "Delta Force" and the MW3 Delta Force Logo[4] within MW3 and the MW3 Guide.

### B.   Plaintiff's Business and Trademarks

Plaintiff is a developer and global publisher of computer and video games for consoles such as Play Station and XBox.  In 1998, Plaintiff developed its first version of Delta Force, a military first person shooter game.  Since 1998, Plaintiff has published at least ten versions of Delta Force, and grossed over $150 million in worldwide sales.  Delta Force was the first game to incorporate many innovations that are now considered standard for first person shooter games, including the use of military livery in large, open environments and in large-scale internet multi-player engagements.  Plaintiff continues to develop new versions of the Delta Force series.

In December 1999, Plaintiff registered a word mark for the text "Delta Force" with the United States Patent & Trademark Office ("PTO"), U.S. Registration No. 2,302,869.  In April 2003, Plaintiff registered a design mark for its logo with the PTO, U.S. Registration No. 2,704,298.[5]  Plaintiff's

---

[1]   Activision Blizzard and Activision Publishing are collectively referred to as "Activision."

[2]   BradyGames is a division of Penguin.

[3]   For some unknown reason, Activision and Penguin are the only parties moving for partial summary judgment.  Activision and Penguin contend that Plaintiff's claims against the other defendants are without merit and will be addressed at a later time.  *See*, Motion , p. 2.

[4]   The MW3 Delta Force Logo consists of a triangle punctuated by a lightning bolt, with an upright knife in the center of the triangle, encased with a circle bearing the words "Delta Force - United States Army."  The MW3 Delta Force Logo is rendered in blue, silver and white.

[5]   Plaintiff's registered word mark for the text "Delta Force," U.S. Registration No. 2,302,869, and Plaintiff's registered design mark, U.S. Registration No. 2,704,298, will be referred to collectively as the "Registered Trademarks" and the Registered Trademarks appear as Exhibits 81 and 82.

logo consists of a delta symbol with a vertical lightning rod superimposed onto a dagger.[6] Plaintiff owns the Registered Trademarks, which are in full force and effect, and they have become incontestable pursuant to 15 U.S.C. § 1065.[7]

### C. Call of Duty – Modern Warfare 3 Video Game

Activision is a very successful video game publisher, engaged in the business of developing, financing, producing, marketing and distributing high quality computer software games. Activision is the publisher of the extremely successful "Call of Duty" series of video games. The "Call of Duty" games are military action fantasy games in which a player assumes control of a military soldier and fights against a computer-controlled or human-controlled opponent across a variety of computer generated battlefields to determine the outcome of the game.

The original "Call of Duty" was released in 2003 and was followed by "Call of Duty 2" in 2005 and "Call of Duty 3" in 2006. In 2007, Activision released the first of its "Call of Duty – Modern Warfare" series of games. By 2011, Activision had released the current version of MW3 which is at issue in this action. The "Call of Duty - Modern Warfare" games take place in the near future and place players in the role of modern day soldiers involved in high risk combat operations throughout the world.

In 2011, MW3 was released for XBox 360, Play Station and Wii consoles and for Windows personal computers. In the first sixteen days of sales, Activision grossed approximately $1 billion from the sales of MW3.

MW3 is a fully cinematic experience featuring story, dialog, music, effects and all of the other elements found in a big budget entertainment franchise. MW3 is a very realistic and convincing, albeit violent, portrayal of modern combat operations.[8] The weapons depicted in the MW3 video are extremely realistic and the locations around the world, such as New York and Paris, are readily identifiable by the use of landmarks, such as New York Stock Exchange and the Eiffel Tower. In addition, the names and logos of actual combat forces are used, such as the U.S. Army Rangers and British Special Air Service.

---

[6] Exhibits 75, 80, and 82 illustrate Plaintiff's design mark. In order to clearly distinguish the various logos at issue in this case, the Court has adopted and will use in this Order the following: (1) "Plaintiff's Logo" is depicted in Exhibits 75, 80, and 82; (2) Activision's "MW3 Delta Force Logo" is depicted in Exhibit 88; and (3) the "U.S. Army Logo" is depicted in Exhibits 5 and 6. An illustration of each of the logos is set forth in Appendix A to this Order.

[7] Activision Publishing has filed a counterclaim in this action seeking cancellation of the Registered Trademarks.

[8] Activision lodged a retail copy of the XBox 360 version of MW3 (Exhibit 2) and a functioning XBox 360 console. Because two players are required to participate in Mission 6 in MW3, the Court requested and Activision provided the Court with an additional controller. In addition, Exhibit 3 contains footage from MW3 that captures the use of the phrase "Delta Force" and the MW3 Delta Force Logo in various missions throughout the game.

### 1. MW3 Single-Player Mode

The single-player mode of MW3 is a story-based military adventure that takes place in the year 2016. In this hypothetical near-future, the United States is at war with Russia, and World War III is imminent. Meanwhile, a terrorist group, led by villain Vladimir Makorov, has obtained access to Russian nuclear weapons and threatens to destroy the Western world. MW3 tells the story of a group of elite international soldiers tasked with a variety of high-risk missions to save the world and stop Makorov, such as securing a radio tower in New York, rescuing the U.S. Vice President in Germany, infiltrating a hotel in Prague, stopping a kidnaping plot in Siberia, and ultimately capturing Makorov in the Arabian Peninsula.

The single-player mode is divided into discrete missions, or levels, and the player's perspective shifts between a few main characters from mission to mission. Before each MW3 mission, the player is given a mission briefing and then the logo of the special forces unit featured in the upcoming mission is displayed. Each special forces unit has its own unique circular logo. For example, the Russian FSO logo consists of a red star with a Soviet hammer and sickle inside, and a British SAS logo consists of a set of wings with a downward pointed dagger in the center.

In nine out of the sixteen missions, MW3 players play a member of a Delta Force team. Delta Force is first introduced in a mission entitled "Black Tuesday" and the Commander of the Delta Force team is Sgt. Derek Foster. Before each mission featuring Sgt. Foster and his Delta Force Unit, the MW3 Delta Force Logo is briefly displayed

According to Activision, the MW3 Delta Force Logo evokes the U.S. Army Logo but modifies the design by repositioning the triangle lightning bolt image; replacing the dagger with a knife and including the words "Delta Force - United States Army" along the edge of the seal. Plaintiff correctly notes that the U.S. Army Logo referred to by Activision is not a logo of any unit officially acknowledged by the Pentagon.

### 2. MW3 Multi-Player Mode

In addition to the single-player story-driven mode, MW3 includes a multi-player mode in which each player fights against or alongside other players in a computer-generated battlefield or "map." There are 16 multi-player maps shipped with MW3, and each of these maps pits two military units against each other. The special forces teams participating in the matches are pre-designated based upon the nature and location of the map. When a player joins a multi-player match, the player is assigned to a team and the screen displays a list of the teams and their logos together with the names of the players who have selected each team. The name of the player's team and its logo are displayed at the beginning and at the end of each match.

Seven multi-player maps pit the Delta Force against the Russian Special Force known as Spetnaz. In these seven maps, the phrase "Delta Force" and the MW3 Delta Force Logo are displayed during the match-making process and at the end of the match as part of the scoreboard. In addition, if the player has elected to play on the Delta Force team, the phrase "Delta Force" and the MW3 Delta Force Logo are displayed at the beginning of the match. There are several logos and symbols displayed, including the logos of various military special operation units, the logos of various branches of the United States government (such as the Department of Defense), and

easily-recognized symbols for international symbols of biohazard or nuclear materials. It is undisputed that the phrase "Delta Force" and the MW3 Delta Force Logo appear for only a short time in connection with each multi-player match.

### 3. Special Operations Mode

The third game mode in MW3 is known as the "Special Operations" or "Spec Ops" mode. "Spec Ops" is split into two components: "Survival" mode and "Mission" mode. In "Survival" mode, players fight against ever-increasing waves of enemies. The "Spec Ops" mode can be played solo or with multiple players. At certain points in the "Survival" mode, players can call in reinforcements such as members of the Delta Squad.

### 4. Use of the Phrase "Delta Force" and the MW3 Delta Force Logo in MW3

There is no evidence that Activision uses the phrase "Delta Force" or the MW3 Delta Force Logo outside of the video game itself. It is undisputed that Activision does not use the phrase "Delta Force" or the MW3 Delta Force Logo in the MW3 title, on the MW3 video game disc itself, in any package used for MW3, or in any advertising for MW3.

In addition, the MW3 box is clearly marked as to its origin and source, and it prominently displays the title "Call of Duty - Modern Warfare 3." The MW3 box also clearly identifies the publisher of the game as Activision (and its affiliated studios, Infinity Ward and Sledgehammer Games) and uses a distinctive white and green color scheme. There is absolutely no reference to Plaintiff or any of its games on any of the MW3 materials and MW3 does not claim or suggest in any manner whatsoever that it was made by or with the assistance of Plaintiff.

## D. Activision's Licensing Agreements with Co-Defendants[9]

### 1. The Microsoft Licensing Agreement[10]

In 2011, Activision entered into an "XBox 360 Bundle License Agreement" and an "XBox 360 Publishing License Agreement" with Microsoft and Microsoft Leasing G.P. (collectively, "Microsoft"), the manufacturers of the video game console XBox 360, whereby Microsoft was granted the right to distribute and sell the XBox 360 version of MW3 as part of a bundle that was defined as a retail item consisting of an XBox 360 console (including all hardware and software traditionally sold with the XBox 360) and a copy of the MW3 game.

Thereafter, Microsoft released its "bundle" consisting of a copy of the MW3 game and a

---

[9] On May 22, 2013, the Court granted the Joint Application to File Certain of Defendants' Highly Confidential Documents Under Seal, including portions of Exhibit 84, and the Licensing Agreements were filed under seal on May 22, 2013.

[10] Although Microsoft is a defendant in this action, it has not moved for partial summary judgment or joined in Activision and Penguin's Motion. The licensing agreement between Activision and Microsoft is discussed for completeness and because it is relevant to Plaintiff's cross-branding theory.

limited edition XBox 360 console prominently displaying the MW3 Delta Force Logo. The outside packaging of the XBox 360 and the console also contained the MW3 Delta Force Logo. The licensing agreement granted a publisher trademark grant to Microsoft "solely for the purpose of facilitating and pursuing [Microsoft's] Game License in connection with Microsoft's marketing, advertising, sale and distribution of the 'bundle.'"

## 2. The BradyGames Licensing Agreement

In 2011, Activision also entered into a "Strategy Guide Publishing Agreement" with DK/BradyGAMES ("BradyGames"), a division of Penguin, and Id Software to create, publish, distribute, and sell strategy guidebooks for among other products the XBox 360 MW3 game. BradyGames is a publisher of high-quality video game strategy guidelines. In general, video game strategy guides are publications that provide various information, illustrations, hints, maps, strategies, secret codes, diagrams and other various background materials of interest to those playing (and attempting to beat) a game. The licensing agreement specifically granted a non-exclusive right and license to incorporate licensed footage from MW3 to produce a video game strategy guide. It also allowed BradyGames to use the title of the MW3 game for the sole purpose of promoting the strategy guide.

The MW3 Guide published by BradyGames is a 350-page book featuring a detailed walk through the game, including illustrations of maps, lists of objectives, tactics and strategies, weapon statistics, the locations of objects and hidden items, and thousands of in-game screen shots.

The only use of the phrase "Delta Force" and the MW3 Delta Force Logo in the MW3 Guide is the description of each of the Delta Force missions. Specifically, beneath the title of the mission there is a tiny image of the MW3 Delta Force Logo and the phrase "Delta Force." The phrase "Delta Force" and the MW3 Delta Force Logo appear on six pages of the 350-page MW3 Guide and the single word "Delta" appears on seven pages. Plaintiff points out in its objection to Undisputed Fact 85 that the MW3 Delta Force Logo appears in multiple forms on the seven pages and that on the seventh page (which is the unpaginated page appearing after page 350) the MW3 Delta Force Logo is used five times

The MW3 Delta Force Logo is depicted only inside the MW3 Guide, only in connection with the Delta Force mission, and is extremely small and serves a description function. The MW3 Delta Force Logo is used logically and artfully in the context of the MW3 Guide. The MW3 Guide does not use the phrase "Delta Force" or the MW3 Delta Force Logo on its cover, except that the back cover depicts a sample page from the guide reflecting the Delta Force Black Tuesday mission.

The MW3 Guide does not reference Plaintiff or its "Delta Force" franchise, and it does not suggest any affiliation or relationship with Plaintiff. The MW3 Guide clearly identifies that it is a guide for MW3, contains the MW3 cover image on its cover, and prominently displays the Activision, Infinity Ward, and Sledgehammer Games names and logos on its front and back cover. Plaintiff admits that it has no evidence that any person purchased MW3 or the MW3 Guide as a result of mistaken belief that such products were affiliated with, sponsored by, or otherwise related to Plaintiff's "Delta Force" games.

### 3. The Turtle Beach Licensing Agreement[11]

In 2011, Activision entered into a "Merchandise Master Agreement" with Turtle Beach whereby Activision granted a license to use the names, logos, trademarks, artwork, and other materials it provided. Turtle Beach released four sets of headphones that contain a version of the MW3 Delta Force Logo on the outside of one of the earcups and on the packaging of the headsets which is visible through the plastic cover.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. Discussion

---

[11] Although Turtle Beach is a defendant, it has not moved for summary judgment or joined Activision and Penguin's Motion. The licensing agreement between Activision and Turtle Beach is discussed for completeness and because it is relevant to Plaintiff's cross-branding theory.

### A. Evidentiary Objections

#### 1. The Standard Regarding the Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In other words, for an expert's testimony to be admissible, (1) the expert must be qualified; (2) the expert's testimony must be relevant, i.e., must assist the trier of fact to understand the evidence or determine a fact in issue; and (3) the expert's testimony must be reliable. The Court has a basic gatekeeping function to ensure that testimony meets these requirements, and is entitled to broad discretion in discharging this function.

The Supreme Court, in *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993), provided the Court with a non-exclusive, nondispositive list of factors to use in assessing the reliability of an expert's testimony: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community. The Supreme Court expanded this analysis in *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), holding that *Daubert* gate keeping function also applies to testimony of experts who are not scientists, but who have "technical" and other specialized knowledge. *Id.* "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a 'reliable basis in knowledge and experience of the [relevant discipline].'" *Id.* at 149.

However, as the Supreme Court further explained in *Kumho Tire*, these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Indeed, the Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." The key question is whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology." A court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The proponent of the expert testimony has the burden of establishing Rule 702's admissibility requirements by a preponderance of the evidence. See Fed. R. Evid. 702 Advisory Committee's Note. As the Ninth Circuit held in *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th

Cir. 2000), the Court need not conduct a separate, pretrial evidentiary hearing to determine the admissibility of the proffered expert testimony.

In the interest of brevity, as the parties are well aware of the substance of their objections and the grounds asserted in support of each objection, the Court will not review the substance or grounds of all the objections here with the exception of discussing the objections related to Plaintiff's expert, Dr. Russell S. Winer ("Dr. Winer")[12], and Plaintiff's CEO, John Garcia ("Garcia").[13] In addition, to the extent that the Court has relied on other evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

### 2. Activision and Penguin's Evidentiary Objections to the Declarations of Dr. Winer and Garcia

Activision and Penguin filed numerous objections to the evidence submitted by Plaintiff in support of its Opposition to Activision and Penguin's Motion, including objections to the declarations of Dr. Winer and Garcia.[14] *See,* Moving Defendants' Objections to Evidence Submitted by Plaintiff Novalogic, Inc. In Opposing the Motion for Partial Summary Judgment [filed June 3, 2013; Docket No. 73-2] ("Objections").

#### a. Activision and Penguin's Evidentiary Objections to the Declaration of Dr. Winer

In their Objections, Activision and Penguin object to Dr. Winer's qualifications to opine on the "artistic relevance" issues in this case. However, it is unnecessary for the Court to rule on that objection because its Response, Plaintiff concedes that the objection is well taken and further concedes that Dr. Winer "makes no claim to be an expert on artistic relevance." Similarly, Plaintiff concedes that Activision and Penguin's objections to Winer's statement in paragraph 37 of his declaration that Activision "claims that the Logo has **no artistic relevance to MW3 whatsoever**" should be sustained but then argues that this misstatement should be ignored because it is only one clause out of a sixty-seven paragraph declaration "that is incongruent with Defendants' position." Response, 4:10-14. Although Plaintiff argues that this error should not impact the balance of Dr. Winer's testimony, the Court disagrees. Dr. Winer's attempt to offer opinions on artistic use which implicate the first prong of the *Rogers* test when he is admittedly not qualified to do so infects the balance of his opinions and further supports the Court's conclusion that his testimony is unreliable.

---

[12] The May 13, 2013 Declaration of Russell S. Winer in Support of Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment ("Winer Decl.") is Docket No. 57.

[13] The May 13, 2013 Declaration of John Garcia in Support of Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment ("Garcia Decl.") is Docket No. 58.

[14] Plaintiff responded to Activision and Penguin's evidentiary objections in its Responses to Moving Defendants' Evidentiary Objections to Evidence Submitted by Plaintiff in Opposing the Motion for Partial Summary Judgment [filed June 10, 2013; Docket No. 80] ("Response").

As to Dr. Winer's summary of opinions (Winer Decl. at ¶ 11), the Court concludes that Dr. Winer has failed to demonstrate the specific facts that he relied on in forming those opinions. For example, Dr. Winer fails to identify the products he examined, how he conducted the examinations and, importantly, if he even played the MW3 game or reviewed any game footage from the MW3 game. In addition, Dr. Winer has not undertaken any research or considered the origins of the phrase "Delta Force" and the MW3 Delta Force logo or that the phrase "Delta Force" and its insignia predated Plaintiff's game and have a real world significance other than as the name and corresponding logo of Plaintiff's game franchise. Without such a showing, the Court cannot determine if there is an appropriate or proper basis for Dr. Winer's assumptions about the facts or the products in this case.

Moreover, Dr. Winer has failed to demonstrate, other than in a very general and conclusionary fashion, how his admittedly extensive knowledge or expertise has been reliably applied to the facts of this case. Specifically, Dr. Winer fails to explain how his experience leads to the conclusions he reaches, why that experience is a sufficient basis for his opinion, and how that experience is reliably applied to the facts of this case. The Court concludes that Dr. Winer's statements regarding consumer choice and cross-branding lack foundation, are not supported by evidence in this case, and, most importantly, do not appear to be based on any discernable methodology. Instead, those opinions are based on broad notions and theories of branding and Dr. Winer's testimony on those issues is essentially a compendium of his personal beliefs that are irrelevant to this issues in this case. Finally, Dr. Winer's attempt to offer an opinion as to a significant potential for confusion in the marketplace based on the *Sleekcraft* factors is both unreliable and not helpful to understanding the evidence or determining a fact at issue in this case. As Dr. Winer candidly admits, his analysis is incomplete because he does have detailed information on a number of the *Sleekcraft* categories to render such an opinion. Winer Decl. at ¶ 56. More importantly, as discussed *infra*, the intermingling of the *Rogers* test and the *Sleekcraft* factors is directly contrary to the Ninth Circuit's holding in *Mattel*. See *Mattel*, 296 F.3d at 900 ("[A]pplying the traditional test fails to account for the full weight of the public's interest in free expression").

### b. Activision and Penguin's Objection to Garcia's Declaration

As discussed *infra*, even if the *Sleekcraft* factors were relevant to this case (which they are not), the Court concludes that the relevant *Sleekcraft* factors weigh heavily in favor of Activision and Penguin. For example, as to actual confusion which is often paramount in the likelihood of confusion analysis, Plaintiff has failed to offer any evidence of any independent consumer surveys or polls which are usually performed in this type of case. Instead, Plaintiff relies on inadmissible anecdotal evidence in an effort to demonstrate instances of actual confusion.

In paragraph 9 of his declaration, Garcia attaches Exhibit 77 which is purportedly offered to prove the confusion of one of Plaintiff's customers. However, Exhibit 77 attached to the Garcia Declaration does not in any way support Garcia's statement. In fact, the document that Garcia refers to in his declaration (Bates No. 49637) is not even the same document that was attached to his declaration (Bates No. 9709). In addition, Plaintiff has offered Exhibit 78 (which consists of

Bates Nos. 49633, 49685, 49686, and 49688)[15] as evidence that supports Garcia's statement in paragraph 10 of his declaration "that other instances of actual confusion among consumers appear on the Internet though forum postings, YouTube videos and Facebook." Garcia Decl, at ¶ 10. However, as Activision and Penguin correctly point out in their Objections, and the Court agrees there is no foundation for this testimony. Moreover, this testimony constitutes improper opinion testimony by a lay witness and inadmissible hearsay with no applicable exception. Furthermore, even if there was any admissible evidence of actual confusion, the Court concludes that it can be dismissed as, at best, de minimis. *See Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606-07 (9th Cir. 1987) (holding that court had acted properly in concluding that "any actual confusion was de minimis").

### B. First Amendment Protection Extends to Video Games, Including MW3.

In light of *Brown v. Entertainment Merchants Assn.*, 131 S.Ct. 2729 (2011), it is clear that video games, such as MW3, are core speech that are entitled to the full protection of the First Amendment. The Supreme Court recognized that video games use the same literary devices found in other media, that the games are used to convey ideas and social messages, and that video games are expressive speech indistinguishable or on a par with plays, films, and literature. Specifically, the Supreme Court stated that:

> Like the protected books, plays, and movies that preceded them, video games communicate ideas – and even social messages – through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection…. [W]hatever the challenges of applying the Constitution to ever-advancing technology, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary" when a new and different medium for communication appears.

*Id.* at 2733.

After reviewing the copy of MW3 lodged with the Court, the Court concludes that based on its compelling narrative and music, distinctive characters, how the players interact with the virtual environment as they complete a series of combat missions, how players can interact with other players, and how players control the fate of the characters and the world that they inhabit, MW3 is an expressive work entitled to as much First Amendment protection as any motion picture or any other expressive work.

---

[15] Because the DVDs lodged with the Court that purportedly contained Exhibit 78 were incomplete, the Court requested that counsel for Plaintiff lodge a complete copy of Exhibit 78. On June 17, 2013, counsel for Plaintiff lodged a thumb drive with the Court that contained a full and complete copy of Exhibit 78.

### C. Plaintiff's Claims Against Activision Penguin Are Barred by the First Amendment.

Although the Court concludes that MW3 is an expressive work entitled to full First Amendment protection, that conclusion does not resolve the more difficult issue presented by this Motion which is whether the First Amendment grants Activision and Penguin the right to violate Plaintiff's Registered Trademarks by using those trademarks within MW3 and the MW3 Guide.

In commenting on the doctrine at the intersection of trademark law and the First Amendment as an unsatisfying splintering of analytic methodologies, McCarthy attempts to summarize the somewhat chaotic state of the law:

> There is a problem that faces one who is accused of infringing a trademark and who claims that she is merely using another's trademark in a non-infringing manner to convey some social, artistic, entertainment or political expression protected by the First Amendment as free speech. The problem is that there is no easily articulated, clearly defined legal principle that can quickly resolve the conflict. There is no statutory or judge-created safe harbor or affirmative defense that easily resolved such conflicts. Rather, there is a buffet of various legal approaches to choose from. Different courts will choose different approaches and some courts will use more than one.

6 *McCarthy on Trademarks and Unfair Competition*, § 31:139 (4th ed.).

However, the law is clear in the Ninth Circuit. To reconcile a defendant's First Amendment interests with a plaintiff's Lanham Act claim, the Ninth Circuit has explicitly adopted the influential *Rogers* test, developed by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989).

In *Rogers*, the Second Circuit was faced with a Lanham Act false endorsement claim brought by Ginger Rogers against a film maker, contending that the titled of his movie, "Ginger & Fred," which told the story of two fictional Italian cabaret performers who imitate Ginger Rogers and Fred Astaire in their cabaret act, created the false impression that Rogers was associated with the film or that the film was about her.

In resolving the Lanham Act claim against Rogers, the Second Circuit concluded "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." Thus, the Second Circuit developed a test under which the title of an expressive work will be protected by the First Amendment if it has at least some artistic relevance to the work and is not explicitly misleading as to the content of the work.

The Ninth Circuit agreed with the Second Circuit's analysis and adopted the *Rogers* test as its own "for deciding whether the First Amendment protects expressive works against Lanham Act claims." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002). In *Mattel*, the Ninth Circuit found against the "Barbie" trademark holder in its Lanham Act claim against the music companies responsible for a song entitled "Barbie Girl," which was an expressive work that made fun of the values represented by Barbie.

In *E.S.S. Entertainment 2000 v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008), the Ninth Circuit extended the Rogers test beyond mere titles of artistic works to cover the use of trademarks in the body of the work. In that case, E.S.S. operated a strip club featuring females dancing nude under the name of "Play Pen Gentlemen's Club" and complained that the use of "Pig Pen" in the "Grand Theft Auto" video games violated E.S.S.'s trademark rights. *Id.* In applying the *Rogers* test, the Ninth Circuit held that the depiction of the "Play Pen," an L.A. Strip Club, in the video game "Grand Theft Auto: San Andreas" as "Pig Pen" did not violate the strip club owner's trademark and trade dress protection under the Lanham Act; and concluded that the game's creator's use of the term "Pig Pen" was protected by the First Amendment. *Id.;* see also *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003) (a claim involving a photograph featuring three likeness of Tiger Woods, and holding that the *Rogers* test is generally applicable to all Lanham Act cases involving artistic works where the defendant has articulated a colorable claim that the work is protected by the First Amendment).

Under the two part Rogers test for Lanham Act claims adopted by the Ninth Circuit "an artistic work's use of a trademark that would otherwise violate the Lanham Act is not actionable" unless (1) the use of the mark has "no artistic relevance to the underlying work whatsoever" or (2) it has some artistic relevance, but "explicitly misleads as to the source or the content of the work." *E.S.S.*, 547 F.3d at 1100.

Courts in this district have applied the *Rogers* test and concluded that the use of a former football player's likeness in the defendant's video game was protected by the First Amendment. *Brown v. Electronic Arts, Inc.*, 2009 WL 8763151 (C.D. Cal. Sept. 23, 2009). In *Brown*, which involved a claim for violation of Section 43(a) of the Lanham Act, the district court concluded that the plaintiff failed to meet the second prong of the *Rogers* test because "mere use of [the plaintiff's] likeness in the game, without more, was insufficient to make the use explicitly misleading."[16]

        **1.**       **The Phrase "Delta Force" and the MW3 Delta Force Logo Have Clear and Direct Artistic Relevance to MW3 and the MW3 Guide.**

The *Rogers* test is relatively straightforward to apply, and is very protective of speech. As to the first prong, "under *MCA Records* and the cases that followed it, only the use of a trademark with 'no artistic relevance to the underlying work whatsoever' would not merit First Amendment protection. In other words, the level of relevance merely must be above zero."[17] *E.S.S.,* 547 F.3d

---

[16] *Brown v. Electronic Arts, Inc.* is currently on appeal to the Ninth Circuit. The *Brown* case was consolidated with *Keller v. Electronic Arts, Inc.*, 94 U.S.P.Q.2d 1130 (N.D. Cal. 2010), and, following the untimely death of Judge Pamela Rymer, the cases were re-argued on July 19, 2012. However, the *Keller* case does not assist Plaintiff because it involves a right of publicity claim, and not a Lanham Act claim, by a former college football player against a video game publisher for using his identity as a college athlete in its video game.

[17] In fact, as long as some artistic relevance exists, even a defendant's intent to use the trademark for promotional purposes does not forfeit First Amendment protection or trump artistic relevance. For example, in *Mattel*, the court dismissed the plaintiff's claim on First Amendment grounds, even though the defendant undisputedly used the "Barbie" trademark to "create[ ] and s[ell] to consumers in the marketplace commercial products . . . that bear the Barbie mark." 296

at 1100.

In this case, Plaintiff has failed to offer any evidence demonstrating that Activision's use of the phrase "Delta Force" and the MW3 Delta Force Logo in MW3 has no artistic relevance to MW3.[18]  In the absence of such evidence and after evaluating MW3 as a whole, the Court concludes that the use of the phrase "Delta Force" and the MW3 Delta Force Logo easily met the artistic relevance requirement under *Rogers* because their use is not wholly unrelated to the content of the work.  The use of the phrase "Delta Force" and the MW3 Delta Force Logo give users of MW3 a sense of a particularized reality of being part of an actual elite special forces operation and serve as a means to increase specific realism of the game.  Moreover, they help satisfy the ever increasing demand for "authentic simulation" in video games and add immensely to the enjoyment users receive from playing the complicated game, which undoubtably accounts for its enormous success.[19]

### 2. The Use of the Phrase "Delta Force" and the MW3 Delta Force Logo in MW3 and the MW3 Guide Does Not Expressly Mislead as to Plaintiff's Sponsorship or Endorsement.

---

F.3d at 903; *see also Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 591 (2012) (holding that there was no "triable issue of material fact," even though the use of the defendant's trademark may well have been "merely a crass marketing tool," not an artistic decision based upon the [product's] subject matter").

[18]  Plaintiff argues that any use of the MW3 Delta Force Logo outside of MW3 and the MW3 Guide, such as on the Microsoft XBox 360 console or the Turtle Beach headsets, forfeits Activision and Penguin's First Amendment rights to use the logo inside MW3 and the MW3 Guide.  However, despite Plaintiff's argument to the contrary, courts have consistently held that First Amendment protection for expressive use does not rise or fall because of other, non-expressive uses, even promotional or outright commercial ones.  *See Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47, 52 (2006) (holding that the First Amendment applies to video games even where "[s]everal promotional products are associated with the game," including a strategy guide, lunch box, and Hot Wheels car); *Mattel*, 296 F.3d at 899 (holding that the First Amendment applies where the defendant "entered into cross-licensing agreements and developed a coordinated plan to distribute [the] promotional copies of the Barbie Girl single and the *Aquarium* album").  As discussed *infra*, Activision's licensing agreement with the other defendants, including Microsoft and Turtle Beach, do not address, or even mention, the MW3 Delta Force Logo, and, thus, could not somehow implicitly waive Activision's First Amendment rights.

[19]  The same conclusion is true with respect to the MW3 Guide.  The use of the phrase "Delta Force" and the MW3 Delta Force Logo to describe the MW3 missions in which the Delta Force team are featured is artistically relevant to the book because it would be impossible to accurately describe the Delta Force MW3 missions without referencing Delta Force.

Plaintiff also fails to meet the second prong of the *Rogers* test. "To be 'explicitly misleading,' a defendant's work must make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of the plaintiff's name or other characteristic." *Dillinger, LLC v. Electronic Arts Inc.*, 2011 WL 2457678, *6 (S.D. Ind. June 16, 2011) (citing *Rogers*, 875 F.2d at 1001). Without such an affirmative statement, the second prong of the *Rogers* test is not satisfied because the "mere use [of a mark], without more, is insufficient to make the use explicitly misleading." *Roxbury Entertainment v. Penthouse Media Group*, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009); *see also E.S.S.*, 547 F.3d at 1100 (holding that "mere use of a trademark alone cannot suffice to make such use explicitly misleading"); *Dillinger*, 2011 WL 2457678, at *8 ("Plaintiff points to no explicit misrepresentation – that fact alone is dispositive of this issue.").

In this case, it is undisputed that Activision does not explicitly misrepresent or in any manner affirmatively state to the public that Plaintiff is associated with, sponsored, endorsed, or otherwise is the source of MW3.[20] Specifically, there is nothing within MW3 or its packaging the could even arguably be considered explicitly misleading as to any sponsorship or endorsement by Plaintiff. MW3 does not claim or suggest in any way that it was made with the participation or endorsement of Plaintiff. *See Rogers*, 875 F.2d at 999 (giving as examples of "explicit" endorsement the phrases "an authorized biography" or "Jane Fonda's Workout"). In fact, MW3 does not use the phrase "Delta Force" or any version of the U.S. Army Logo, the MW3 Delta Force Logo, or Plaintiff's Logo on MW3's packaging or in any advertising for MW3. *See Brown*, 2009 WL 8763151, at *5 ("The character, and Brown's name, are not depicted on the games' packaging or in their advertising").

In addition, given the huge success of its "Call of Duty" franchise, Activision understandably has made every effort to affirmatively negate any possible confusion regarding the source of MW3. For example, MW3's packaging is very clear as to its origin and source. It prominently displays the title "CALL OF DUTY – MW3," and identifies its makers as "Activision" and its affiliated studios, "Infinity Ward" and "Sledgehammer Games." *See, e.g., Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 592 (2012) (holding that title and cover of the DVD for the film at issue did not explicitly mislead where back cover of film displayed defendant's name and identified the film as a "MARK ATKINS" film). MW3's packaging also explicitly references the earlier "Call of Duty – Modern Warfare Games," touting that "The Best-Selling Franchise in XBox 360 History Is Back." By contrast, each of Plaintiff's Delta Force games prominently displays the title "DELTA FORCE" followed by the subtitle (*e.g.*, "Xtreme," "Urban Warfare") and prominently identifies Plaintiff as the publisher. *See, e.g., Cliffs Notes Inc. v. Bantam Doubleday Dell Publishing Grp., Inc.*, 886 F.2d 490, 492 (2d Cir. 1989) (holding that the defendant's book was not explicitly misleading because of "important differences" between the covers of the plaintiff's book

---

[20] Rather than address the second prong of *Rogers*, Plaintiff applies the *Sleekcraft* "likelihood of confusion" test. However, the intermingling of the *Rogers* test and the *Sleekcraft* factors is directly contrary to the Ninth Circuit's holding in *Mattel*. *See Mattel*, 296 F.3d at 900 ("[A]pplying the traditional test fails to account for the full weight of the public's interest in free expression"). Instead, the *Sleekcraft* test is applied only after the use of a mark is found to have been explicitly misleading or lacking in artistic relevance. Even though the *Sleekcraft* test is not applicable, the Court has considered all of the likelihood of confusion factors and concludes as a matter of law that there is no likelihood of confusion between Activision and Penguin's use of the phrase "Delta Force" and the MW3 Delta Force Logo and Plaintiff's Registered Trademarks.

and the defendant's book).

Moreover, Plaintiff also has not produced any admissible evidence that consumers were misled by Activision into believing that Plaintiff was the source of MW3 or was affiliated with or sponsored the game. *See Dillinger*, 2011 WL 2457678, at *7 ("[D]espite Plaintiff's sweeping allegation, it has presented no evidence that a single consumer was misled in this case"). Furthermore, because the phrase "Delta Force" and its insignia have an established and well-known prior meaning and connotation – as a unit in the U.S. Army – that is unrelated to Plaintiff and that meaning and connotation significantly pre-date Plaintiff's use of the Registered Trademarks it is highly unlikely that consumers will be misled into believing that Plaintiff was the source of MW3 or was affiliated with or sponsored the game.[21] However, even assuming that some consumers might have mistakenly believe that some relationship exists between Activision and Plaintiff as a result of the use of the phrase "Delta Force" and the MW3 Delta Force Logo in MW3, that mistaken belief on the part of those consumers would still not satisfy the second prong of the *Rogers* test. *See Rogers*, 875 F.2d at 1001 ("To the extent that there is a risk that the title will mislead consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression."); *see also Louis Vuitton Mallatier S.A. v. Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172, 184 (S.D.N.Y. 2012) ("Even assuming, *arguendo,* that Louis Vuitton could state a cognizable claim of confusion, Warner Bros.' use of the Diophy bag is protected under *Rogers* because it has some

---

[21] Delta Force, or the "1st Special Forces Operational Detachment – Delta," is a widely known U.S. Army Special Forces unit. Although the U.S. Army has never officially recognized the existence of Delta Force, by most accounts, Delta Force was formed in the 1970s and is an elite counter-terrorism unit, specializing in covert missions, such as hostage rescues and raids. According to books written by former Delta Force members and other accounts, Delta Force was involved in the rescue attempt of American hostages from the U.S. Embassy in Iran in 1979, as well as operations in Grenada, Somalia, Afghanistan, and Iraq. Delta Force has been known to the public and referred to by its nickname as early as 1983, when the purported founder of Delta Force, Charlie Beckwith, published the book "Delta Force: The U.S. Counter-Terrorist Unit and the Iran Hostage Mission," detailing the history of the unit and its role in the aborted 1980 mission to rescue American hostages. Since then, the exploits of Delta Force have been chronicled in dozens of books, newspaper articles, and other materials, many of which reproduce or discuss the U.S. Army Logo. Many of these materials also pre-date Plaintiff's use of the phrase "Delta Force" or Plaintiff's Logo, including: a June 17, 1991 *Newsweek* cover story entitled "Secret Warriors" that depicted the U.S. Army Logo; a 1992 book by Terry Griswold entitled *Delta: America's Elite Counterterrorist Force* that depicted the U.S. Army Logo on its cover; and a 1994 book by Douglas C. Waller entitled "Commandos: The Inside Story of America's Secret Soldiers" which discussed Delta Force.

Because of the public fascination with Delta Force, the phrase "Delta Force" and the U.S. Army Logo have been used extensively in a variety of fictional and cinematic works, many of which pre-date Plaintiff's use of the phrase Delta Force and the U.S. Army Logo, including: the 1986 Chuck Norris film "The Delta Force"; the 1990 Chuck Norris film "Delta Force 2"; the 1991 film "Delta Force 3"; the 1991 romance novel "A Dangerous Man," which features a main character from Delta Force and contains a description of the U.S. Army Logo; and the 1997 television movie "Operation Delta Force"

artistic relevance to the Film and is not explicitly misleading.").

Accordingly, the Court concludes that Plaintiff has failed to present any evidence that raises a genuine issue of material fact that MW3 explicitly misleads as to its source.[22]

### 3. Activision Did Not Waive or Otherwise Surrender Its First Amendment Rights.

In its Opposition, Plaintiff argues that Activision "surrendered" its First Amendment right to depict Delta Force and use its insignia in any of its games because Vivendi Games, Inc. ("Vivendi"), a company acquired by Activision, entered into an agreement with Plaintiff in 2005 to make and distribute several of Plaintiff's games, including Delta Force, on wireless devices (the "2005 Vivendi Contract").

Plaintiff's argument is unpersuasive and borders on the frivolous. Activision was not a party to the 2005 Vivendi Contract and Plaintiff fails to explain how an unrelated third party's contract could have resulted in the surrender of Activision's First Amendment rights with respect to a product, MW3, that was not produced until 2011. In addition, there is nothing in the 2005 Vivendi Contract that supports Plaintiff's argument that by licensing the right to make a mobile version of Plaintiff's games, Vivendi (or Activision) agreed not to portray Delta Force in its own games. The 2005 Vivendi Contract did not purport to restrict Vivendi (or Activision) from depicting the real-life Delta Force or using its logo. In fact, the only mention of Delta Force in the 2005 Vivendi Contract was in the context of identifying "Delta Force" as one of Plaintiff's "brands," along with "Black Hawk Down," "Comanche," and "F-22." Instead, the 2005 Vivendi Contract simply obligated Vivendi to pay Plaintiff a thirty percent royalty on all licensee revenue generated from Plaintiff's games. Thus, the 2005 Vivendi Contract does not constitute the "clear and convincing evidence that the waiver is knowing, voluntary and intelligent" that is necessary to relinquish First Amendment rights.[23] *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 145 (1967) (holding that courts are "unwilling to find waiver in circumstances which fall short of being clear and compelling"); *Erie Telecomminications v. City of Erie*, 853 F.2d 1084, 1095 (3d Cir. 1988)

---

[22] Again, the same conclusion is true for the MW3 Guide. The MW3 Guide does not use the phrase "Delta Force" or the MW3 Delta Force Logo on its cover. It does not reference Plaintiff or Plaintiff's "Delta Force" franchise, or otherwise suggest any affiliation or relationship with Plaintiff. Instead, the MW3 Guide clearly identifies that it is a guide for MW3, contains the MW3 cover image on its cover, and prominently displays the "Activision," "Infinity Ward," and "Sledgehammer Games" names and logos on its front and back covers. Accordingly, the Court concludes that the MW3 Guide does not explicitly mislead as to its source.

[23] Plaintiff is also incorrect that by virtue of Vivendi's entry into the 2005 Vivendi Contract Activision somehow conceded or "under[stood] that the First Amendment did not afford any protection for Activision's use of" the phrase "Delta Force" or the MW3 Delta Force Logo. Prior licensing activity is never an admission that a license is required. *See Campbell v. Accuff-Rose Music, Inc.*, 510 U.S. 569, 585 n. 18 (1994) (rejecting argument that a "request for permission to use the original should be weighed against a finding of fair use . . . [T]he offer may simply have been made in a good-faith effort to avoid this litigation. If the use is otherwise fair, then no permission need be sought").

(holding that courts must "indulge in every reasonable presumption against waiver of fundamental constitutional rights and not . . . presume acquiescence in the loss of such rights").

### D. Activision and Penguin Are Entitled to Summary Judgment on All of Plaintiff's Claims with Respect to MW3 and the MW3 Guide

Because there is no genuine dispute as to any material fact that Activision and Penguin's use of the phrase "Delta Force" and the MW3 Delta Force Logo have artistic relevance and do not explicitly mislead as to source, and because Activision and Penguin have not waived their first Amendment rights, Activision and Penguin are entitled to judgement as a matter of law on Plaintiff's federal claims with respect to Activision and Penguin's use of the phrase "Delta Force" and the MW3 Delta Force Logo in MW3 and the MW3 Guide. Accordingly, Activision and Penguin's Motion is **GRANTED** and they are entitled to summary judgment on Plaintiff's first claim for relief for infringement of Plaintiff's registered trademarks (15 U.S.C. § 1114), second claim for false designation of origin (15 U.S.C. § 1125(a)), and third claim for relief for contributory trademark infringement with respect to MW3 and the MW3 Guide.

In addition, it is undisputed that Plaintiff's claim for relief for common law trademark infringement is premised on the same evidence and arguments as its federal claims and that entry of summary judgment for Activision and Penguin on Plaintiff's federal claims with respect to MW3 and the MW3 Guide is dispositive of Plaintiff's common law trademark infringement claim. *See, e.g, Glow Industries, Inc. v. Lopez*, 252 F.Supp. 2d 962, 975 n. 90 (C.D. Cal. 2002) (noting that "[t]he standard for Lanham Act unfair competition is the same as that for Lanham Act trademark infringement" and "the elements of state claims for trademark infringement and unfair competition are substantially similar to those of the comparable federal claims"). Because Plaintiff's federal claims fail, its claim for common law trademark infringement also fails. Accordingly, Activision and Penguin's Motion is **GRANTED** and they are entitled to summary judgment on Plaintiff's fourth claim for relief for common law trademark infringement with respect to MW3 and the MW3 Guide.

### IV. Conclusion

For all the foregoing reasons, Activision and Penguin's Motion is **GRANTED**. Activision and Penguin are entitled to judgment on Plaintiff's first, second, third, and fourth claims for relief with respect to MW3 and the MW3 Guide.

IT IS SO ORDERED.

**APPENDIX A**



Novalogic, Inc. Logo
(Ex. 82)



Army Logo
(Ex. 6)



Activision MW3 Delta Force Logo
(Ex. 88)

APPENDIX A